Lucas *et al.*, *vs.* Lucas.

## LUCAS *et al.*, *vs.* LUCAS.

1. That relief will be granted from a mistake as to the legal effect of an instrument, is law, settled by adjudications of this Court and by statute.
2. The evidence shows such a mistake in the verdict in this case.
3. A motion to set aside a verdict and reinstate the case, is equivalent to a motion for a new trial, and is a proper remedy for a mistake in the verdict.
4. The nominated executor and propounder of a will is a legal party on behalf of the legatees, to conduct the litigation involved in a *caveat* to the will, from the beginning to a final adjudication.

Motion to set aside verdict, etc. Decision by Judge CABANISS,.at the August Term, 1859, of Monroe Superior Court.

This motion was predicated upon an alleged misunderstanding and mistake as to the terms and effects of an agreement made by the parties and their attorneys, to settle and terminate the litigation and controversy which had been long pending, relative to the estate and wills, or papers propounded as wills, of the late Littleberry Lucas, deceased.

The agreement and consent sent up were as follows :

" JAMES M. PARSONS and WIFE,
" ELZA HALSTEIN and WIFE, and    Caveat, in Monroe Su-
" PEGGY LUCAS, propounders,       perior Court. On
            *vs.*                  Appeal.
" CINCINNATUS M. LUCAS, caveator.

" CINCINNATUS M. LUCAS, propounder,
            *vs.*                  Caveat, in Monroe
" JAMES M. PARSONS and WIFE,      Superior Court.
" ELZA HALSTEIN and WIFE, and     On Appeal.
" PEGGY LUCAS, caveators.

"It is hereby agreed by the parties to the above stated cases, that C. M. Lucas shall qualify as executor on that portion of the will of 1845, set up by the verdict of the jury, to-wit : a part of the 14th item of said will, and that his qualification shall only extend to the property, to-wit : the land and negroes specified in said part of said item of said will, and shall not include any increase of said negroes born since the execution of said will.

Lucas *et al.; vs.* Lucas.

"It is further agreed that Mrs. Peggy Lucas, C. M. Lucas and James M. Parsons shall, or may qualify as administrators on the balance of the estate of Littleberry Lucas, to-wit: all of said estate not included in the foregoing and first item of this agreement, and that neither or all of them will charge for commissions or services as administrators and administratrix.

"It is further agreed that any advancement made by Littleberry Lucas in his life time to either or any of his children shall be estimated in the division of said estate, and that the negroes that have been received from said Littleberry Lucas by either or any of his children, shall and may be kept by those to whom they have been respectively loaned, but that the same, together with their increase, shall be appraised with the balance of said estate, and counted and estimated in the division of the same.

"It is further agreed that all of said estate, excepting what is specified in said first item of this agreement, including all the increase of said negroes in said item mentioned since the execution of said will, shall be equally divided between Mrs. Peggy Lucas, the wife, and the three children of said Littleberry, having reference always in said division to the third item of this agreement.

"It is further agreed that the costs of both of said cases, including witnesses' costs and all cost in the Court of Ordinary, the Superior Court and Supreme Court, which have been paid by either party, or remains to be paid, shall be paid out of said estate.

"It is further agreed that the respective parties litigant shall be reimbursed out of said estate the sum of five thousand dollars for counsel fees.

"It is further agreed that this agreement be entered on the minutes of the Court for the convenient reference of all parties interested."

[Signed by the attorneys for plaintiffs and defendant.]

Appended to the agreement is the 14th item of the will.

The following is the verdict taken and entered under the foregoing agreement, after stating the cases as first above stated, viz:

"We, the jury, find that the 14th item of the will of July, 1845, in favor of James T. Lucas, Love P. Lucas, and La-

Lucas *et al.*, *vs.* Lucas.

Fayette W. Lucas, as far as the same is bequeathed to them, the land and negroes specified in said item, and the appointment of Cincinnatus M. Lucas as executor to execute the said portion of said item, is the true last will and testament of Littleberry Lucas, deceased, and we hereby set up the same, and set aside the balance of said will.   We further find that said Littleberry Lucas died intestate as to the balance of his estate.

(Signed,)                    " L. B. ALEXANDER, Foreman."

The alleged mistake was in this . That the agreement and verdict as entered into and rendered as above,  in setting up the 14th item of the will as to the land and negroes therein devised and bequeathed to the children of Cincinnatus Lucas, carried to, or vested in them the rents and profits of said land and negroes since the death of testator,  whereas it was the intention of the attorneys representing Peggy Lucas, Parsons and Halstein to give the corpus; that is,  the land and negroes, but not the rents and profits aforesaid, but that these should fall to the estate undisposed of, and  be equally divided amongst the heirs-at-law.

Counsel for the plaintiffs in  error  in  the Court below, in the progress of the case there, submitted this proposition as, or in evidence :   " We propose to insert in the written agreement, or in the verdict, at the  option of  the other party, an item that the rent and hire of the lands and negroes shall be a part of the  estate  of L. Lucas, for division between his heirs, and that the motion  to  set  aside be dismissed on that being done."

The following testimony was submitted :

W. Poe said :   On his arrival in Forsyth, we found the matter under consideration for a compromise ; himself and Trippe were authorized by their clients to settle the case ; Mr. Hill came in and joined us, and read some propositions. The first offer of negotiation was, the cavetor of the will, 1845, offered $20,000 00 in money, and the other party demanded the land and negroes bequeathed in the 14th item ; Parsons said he did not like to allow that, it was too much, but would yield if we thought it best; renewed the negotiation, and informed Mr. Hill that we would yield to his proposition and give land and negroes; the difficulty was as to

the manner of carrying out the agreement. It was first suggested to set up the will of 1855, and in framing the verdict, would provide for vesting the land and negroes in the children of C. M. Lucas; Mr. Hill preferred another way; that the 14th item of the will should be set up to the extent of land and negroes, and to declare an intestacy as to the balance of the property; witness stated it was a matter of form, but he had some feeling on the subject, and was opposed to setting up the old will, as he had been fighting it so long, but yielded, as the will of 1855 was but a declaration of the Statute of Distribution of the State of Georgia. Agreed that the land and negroes should be vested in the children in that way; the plan then was to frame the verdict to carry out the agreement, and Mr. Hill commenced writing it. Mr. Trippe not liking the way it was written, then took the paper and wrote the agreement now in Court, and Mr. Hill wrote the verdict; witness got the will of 1845 and estimated the worth of the negroes and land from information, and said that caveators were giving more than he at first expected. Whilst doing this, Mr. Simmons asked what was to become of the crops which had been made on the land? witness replied, they would go with the estate, and that was whilst Trippe and Hill were writing; witness' view was, that nothing was to go into the verdict but the land and negroes, and the object was to carry out that view in the most compendious way. Whilst this was going on, Mr. Hill said he wanted the 14th item of the will set up, and had an object in it; the verdict and papers were read, and in the Court-house the verdict was signed by the jury, and the agreement by the parties. Whilst the arrangement was being made, Mr. Trippe was interrupted by Dr. Burney, on business; witness' purpose was, to give the corpus of the land and negroes, and nothing more; did not express that purpose to Mr. Hill, except inferentially; hire and rent were not mentioned at all, except by Mr. S., and don't know that Mr. Hill heard him; Simmons was only counsel—not one of the referees; no counsel for propounder was present except Mr. Hill; the object of the agreement was to explain the verdict; the verdict was to embody the whole agreement, excepting the increase of the negroes, after the death of the testator, was a matter of discussion.

R. P. Trippe said: That himself and Hill were together

Lucas *et al.*, *vs.* Lucas.

in the morning trying to settle the cases; proposed to give him $20,000; he wanted the land and the negroes; estimated the land and negroes at twenty-two thousand dollars; was urged to accept that, as there was a small difference between the two propositions; Mr. Hill stated there were special reasons why he wanted the land and negroes; witness said that the difference of $2,000 was but $500 each for the parties; it was a nominal sum; proposed that the land and negroes should be estimated, and if Mr. L. was anxious for his children to have them, he could pay them the difference between that extent and the $20,000; adjourned without coming to any agreement; saw his client and he refused to accede to the agreement; in the afternoon he and Mr. Poe took the responsibility to make a settlement, and would meet Mr. Hill; told him they would give him the land and negroes. In the interview in the evening, witness first heard of the birth of negroes' children after the death of testator; Mr. Hill said there were only few; · witness said he would not give another dollar; the question then arose how it should be carried out? Mr. Hill suggested that we would make an award, declaring an intestacy, and in the award give the children the land and negroes; Mr. Poe suggested setting up the will of 1855, and by agreement, give them the land and negroes; Mr. Hill preferred setting up that part of the 14th item giving them the land and negroes, and witness consented on the ground that it would be best to set up that item, as it would bind all parties and be a more formal execution of the agreement, and would more effectually bind the parties; Mr. Poe said we were giving too much, and stated the estimated value of the property at the time; Mr. Hill said two of the negroes were dead and two were worthless; Mr. Poe's estimation was on 20 negroes, when Mr. Hill wanted the negroes born since the execution of the will; witness replied that they would not give one dollar more than was mentioned in that item of the will, adding what was allowed as counsel fees to C. M. Lucas; witness called attention to the amount which was yielded to him; proposed to give the corpus of the land and negroes, and nothing more; thought it was stated a number of times that we were to give nothing more; if it had been claimed, would not have yielded it; we intended to draw the agreement to carry out this purpose—that is, to convey nothing but the land and negroes, without the . increase of the

negroes, rents and profits; that was the intention of witness and all parties, so far as witness knew; rents and profits were not mentioned by name, but that was the intention ; the idea of rents, issue and profits did not occur formally ; when the two little negroes were mentioned, witness said he would yield nothing more than the land and negroes mentioned in the will ; were not authorized to give that much, but would take the responsibility of doing it; not exceeding five minutes after the agreement was signed, witness took Mr. Hill aside and asked him if the rents and profits would be claimed, and he said the point probably would not be raised, but that Mr. Hall said it was a construction of law ; Mr. Hall had already raised the point; witness asked then that an agreement should be put down as they understood it, and that he should call on Mr. Lucas and let it be known what they were to do ; went instantly to Mr. Poe and gave notice to the Clerk not to record the verdict ; called the attention of the Court to it, and sent for Mr. Hill; witness had no authority to go any further than giving the corpus of the land and negroes; Mr. Hill claimed, as the basis of his negotiation, that the 14th item of the will should be set up; did not understand him to say that he would not come to any other agreement ; his proposition was, to set up the 14th item ; $10,000 was to be paid out of the estate for counsel fees—$5,000 on each side, and C. M. Lucas was to be executor of that part of the will set up, and an intestacy declared as to the balance of the estate ; and the reason assigned by Mr. Hill was, that the testator intended the land for the boys ; always understood it to be his will and so Mr. Hill claimed ; the first proposition was, to set up the 14th item.   In the afternoon Mr. Trippe came to Mr. Hill and said that he had got his client willing to do what he and Mr. Poe would say ; went to Mr. Trippe's room ; Mr. Hill suggested to get an order of Court appointing them arbitrators, and that their award be made the judgment of the Court ; Mr. Poe wanted the will of 1855 set up ; Mr. Trippe suggested a verdict, setting up that part of the will of 1855 giving the land and negroes to the boys, with an agreement explaining it ; Mr. Hill said don't let us have any agreement but a verdict ; the verdict was read first to Mr. Poe, and afterwards in the hearing of all ; Mr. Trippe suggested an alteration, and made an interlineation.   After coming into the Court-house, an interlineation was made by

Mr. Trippe; agreed upon the verdict; Mr. Trippe read it to the jury, and it was signed; during all the time of the negotiation, the rents, issues and profits were not mentioned by Mr. Trippe, or in his hearing; while writing the agreement, Mr. Hill was taunting witness about writing so long an agreement; the object was, to cover everything, and to give only the corpus.

T. J. Simmons corroborates the testimony of Messrs. Poe and Trippe, so far as the conversation in Trippe's office; intended to give the land and negroes, estimated at $22,000 00 or $23,000 00; did not know that anything more would be claimed, until it was mentioned after the verdict; nothing was said about rents and profits; witness mentioned the crops to Mr. Poe; Mr. Hill objected to the increase of the negroes being excluded, and said if Dr. Parsons claimed them, he would pay one-half; finally agreed to the little negroes, because it was a small amount; Mr. Trippe positively refused to yield anything but the land and negroes.

### Defendant's evidence.

In relation to the settlement of the issues to the will of Littleberry Lucas, deceased, B. H. Hill said : During the argument of the case before the Supreme Court, His Honor Judge Lumpkin asked why the case could not be settled, as C. M. Lucas had offered to surrender the notes and money for division, and the accumulation of these formed the pretence for the necessity of making the new will, or something to this effect. As counsel for C. M. Lucas, I immediately replied, I was ready to make that settlement. A few weeks ago, I received intimation that the propounders of the will of 1855 were willing to pay the children of C. M. Lucas' legatees, under the will of 1845, the sum of $20,000 00, and allow certain counsel fees and costs to be paid out of the coming fund, and divide the balance. I replied that I thought the case was one which ought to be settled, and that I was willing to settle on principle; and that while I thought the money and notes ought to be divided, I also thought the specific legacies in the will of 1845 to C. M. Lucas' children ought to be set up. When I arrived here in Forsyth, I learned the case was referred to me for settlement in behalf of Lucas, and to Col. Trippe, on the other side. On Monday morning

I called on Col. Trippe, and, in the first place, asked him if he had plenary power to settle the cases? He replied, he did not, but had restricted power, and that he could only settle on the terms above mentioned. I told Col. Trippe that I was authorized to settle, but I was unwilling to settle except on principles of right, as I conceived them, and that I thought the notes and money ought to be divided, and that as much should be applied out of the estate to pay the counsel fees of C. M. Lucas as the fees of the other side ought to have amounted to; that I thought the whole of the 14th item of the will of 1845 ought to be set up and distinctly stated, for the reasons then given; that whatever the children of C. M. Lucas received, must be received as a specific legacy, without being subject to appraisement under the will of 1845. (As to what was said on the question of advancement, need not be mentioned, as it is not involved.) Remarks were then made as to the value of the land and negroes, and by estimating the land at $10,000 00 and the negroes at about $700 per head, we thought the value would be $22,000 00 or $23,000 00, and the other items mentioned in the 14th item of said will would increase it a few thousand. Col. Trippe asked me if I thought the increase of the negroes passed under the will? I replied that I thought the increase, prior to the death of the testator, did not pass. Mr. Trippe had an interview with Mr. Parsons, who happened in, and on returning, said to me he was positively prohibited from doing more than he had proposed. I told him I thought he could inform his client of the nature of my position, and at least get their views on it. He said he did not see why they should seriously object to acceding to my proposition, as far as the land and negroes were concerned, but he did not think they could be brought to agree to the balance of the 14th item. I said I might give up $1,000 00 for ditching, etc., but that I doubted whether I would yield any other point, but at all events, see his clients and see what they would do; I made my proposition, and now wanted to hear from his side. About 10 o'clock Col. Trippe called at my room and said he could do nothing with them men, or they would do nothing more, and I replied, very well, and Col. Trippe immediately left. I informed Mr. Lucas of the result, and he expressed himself satisfied, and the case could go on. After I came into Court-house, Col. Trippe came and took me out and said his clients had finally

Lucas *et al.*, *vs.* Lucas.

agreed to do anything he and Mr. Poe should agree to. I asked him what he thought he and Mr. Poe would agree to? He said he thought they would give us the land and negroes under the 14th item, but as I was of opinion that the increase of the negroes did not legally pass under the will, I must agree to so express it. I told him I thought the increase before the death of the testator did not pass, but the increase after his death did pass, as the will took effect at his death, and I thought the will ought to have its legal effect. He said his client would not agree to it, and the increase of the negroes must be excepted. I told him to go and get Mr. Poe, and we would go to his office and see if he could draw up an agreement that would suit us. When we got to Col. Trippe's office, we discussed as to the best method of having the agreement effectively carried out. I suggested that we enter into an agreement stating the terms of the settlement, and then, by an order of the Court, having the whole matter referred to our discretionary arbitrament, and then we could make our agreement our award, and return it at once as the judgment of the Court. Col. Trippe suggested, that as to the portion of the will of 1845, which was to be set up, the better plan might be to take a verdict, and that the other application might be dismissed, and the other points about costs, lawyers' fees, increase of negroes, etc., could be embodied in an agreement. Col. Poe agreed with Col. Trippe, and I at once agreed to the plan; whereupon I commenced to draw an agreement, and drew the first item, which Col. Trippe said ought not to be in the agreement, as it would be covered by the verdict, and it was, but not to specify in writing that we agreed to a verdict, etc. I assented, and commenced to write the next item. He said that was also covered by the verdict. I then said I did not really see that it was necessary to have any written agreement, but let us write a verdict and settle all by the verdict. Col. Trippe preferred an agreement for explicitness on some points. He then commenced and drew the agreement, and I drew the verdict. I read the verdict, and Mr. Poe assented to it. Col. Trippe, after finishing the agreement, took the verdict and read it, and suggested the alteration appearing by the first interlineation, and which was at once assented to as not altering the meaning. Col. Trippe then read the agreement he had drawn, and I objected to the portion excluding from the effect of the will

the increase of the negroes born after the death of the testator, and said I surely could not think his client would insist on it. That he ought to leave them to pass by the usual construction of the will, and that if his client really, after understanding it, insisted on taking these infants, to write me the fact, and I would pay half their value myself. Col. Trippe said the infants would not be taken away, but that C. M. Lucas could pay for them in the division and let the boys have them. I then said it was a small matter any way, and though I thought it was wrong, I would let it go and agree to the agreement as it stood. But the verdict and agreement were then assented to, and, by agreement, it was to be entered on the minutes of the Court for reference, and I added that to the agreement of Col. Trippe's suggestion, and it was read and agreed to. We came on to the Court-house, and I showed the verdict agreed on to my associate counsel, Col. Hunter, suggested the additional words of the second interlineation, and set aside the balance of said will. Col. Hunter suggested that we add, "and we set aside the will of 1855." Col. Trippe said this was unnecessary, as an intestacy was declared, and it would not alter it to add those words, and he would object to it, and said we ought to be satisfied with it as it stood. I thought so too, and said to Col. Hunter, that I did not think the words suggested at all necessary. The Court was informed that we had agreed on a verdict, and asked for a jury. The first twelve were ordered down, and Col. Trippe read the verdict to the jury, and it was signed and handed to the Clerk. At no time during the negotiation was the question of hire and rent mentioned, either by Mr. Poe, or Col. Trippe, or myself. I will add, the verdict is precisely as it was agreed on ; nothing is inserted which ought to be omitted, and nothing is omitted which was to be inserted ; if the hire and rent are to go to the estate, and not the legatees, the place to insert it is the agreement, and not the verdict ; there was certainly no intention to limit the effect of the verdict in the verdict itself, but that was to be set up in the 14th item as it now expresses it, etc.

*Cross-examination of Mr. Hill by Movants.*

Mr. T. said they would give the negroes mentioned in the 14th item ; when they disagreed before dinner, the difference

Lucas *et al.*, *vs.* Lucas.

was $1,000 00; in the morning estimated the negroes at about $14,000 00; the land at $8,000 00; told Mr. T. to see his client and see if he would give the land and negroes; nothing was said about corpus rents and profits; witness had no doubt the object of Mr. T., in making up the sum to pay the difference between $20,000 00 and $22,000 00, was to give a specific sum for the purpose of making the settlement; when talking about the infant negroes, Mr. Trippe said he would not give one dollar more than he had proposed; if a proposition had been made to exclude the profits of the land and negroes, witness would have objected, but can't say but he might have yielded; can't say but he might have thought of the rents and profits at some time during the negotiation; think they would not have included the rents and profits, if it had occurred. When that part of Mr. Hill's written testimony was read, in which he stated that Mr. Trippe said he thought they would give the negroes and land under the 14th item, he was asked by Mr. Trippe if he said, "under the 14th item," or, "the land and negroes mentioned in the 14th item." And Mr. Hill replied, "the expression was, the land and negroes mentioned in the 14th item."

After hearing said testimony, the Court refused to grant said motion, and overruled the same, on the ground that the Court have no right to correct the alleged mistake or to entertain jurisdiction of the question in the form of proceeding. To which counsel for movants excepted, and counsel for movants, on this the 16th day of November, 1859, (being within thirty days from the adjournment of said Term of said Court,) tender their bill of exceptions, and say the Court erred in refusing to grant said motion, and in overruling the same. And as the facts do not appear on record, the movants pray that this foregoing may be signed and certified as their bill of exceptions in our case, according to the provisions of the statute in such cases made and provided.

R. P. TRIPPE,<br>Movant's Att'y.

TRIPPE & POE, for plaintiffs in error.

B. H. HILL, *contra.*

*By the Court.*—STEPHENS, J., delivering the opinion.

Littleberry Lucas died, leaving two wills—one executed in 1845, and the other in 1855. Cincinnatus Lucas, the defendant in error, being the nominated executor of the older will, propounded it for probate, and the plaintiffs in error propounded the other, each party entering a *caveat* against the probate proposed by the other party. When the two cases thus made stood for trial on the appeal, the parties, through certain of their counsel, Mr. Hill for the defendant in error, and Messrs. Trippe & Poe for the plaintiffs, entered into a negotiation for the settlement of the whole litigation. The negotiation resulted in the taking of an agreed verdict, accompanied by an explanatory paper, the verdict written by Mr. Hill, and the explanatory paper by Mr. Trippe. Within a few minutes after the verdict had been taken, the plaintiffs moved to set aside on the ground that, by their mistake of its legal effect, the verdict, with the explanatory paper, had been so framed as not to carry out the true settlement to which they had agreed. The defendant met this motion with four objections: First, that the ground on which it is founded is not good in law, if true in fact. Second, that it is not true in fact. Third, that the proper remedy is not a motion to set aside the verdict, but a bill to reform the agreement on which the verdict is founded. Fourth, that the minor children of Cincinnatus Lucas have an interest in the verdict, and are not legally represented before the Court. The presiding Judge sustained the third objection, and overruled the motion. We think all of the objections are bad, and that the motion ought to have been granted.

1. The principle of granting relief from a mistake as to the legal effect of an instrument, is established by repeated adjudications of this Court, and also by statute. An Act of 1858, (see *Acts of that year p.* 74,) in attempting to do several things, does accomplish this: it converts into statutes, from the time of its passage, all such decisions of this Court as had been made before its passage, with the concurrence of a full bench. Now, the case of *Wyche and wife vs. Greene,* in 11 *Ga. Rep.,* 159, and again in 16 *Ga. Rep.,* 49, had been decided by a unanimous full bench long before the passage of that Act; and the very point decided in it, is the principle in question. In that case, a man made a deed of

Lucas *et al.*, *vs.* Lucas.

gift to his married daughter and "her issue," *intending* to give her an estate for life with remainder to her children, and supposing that the words he had used would have that legal effect. The legal effect of the instrument was, of course, to vest the whole estate immediately in the husband of the woman; but the Court held that it ought to be so reformed as to carry out the true intention of giving to her for life, with remainder to her children. The principle is, that where there is a difference between the legal effect produced by the words, and the effect intended to be produced by them, the words, with their mistaken effect, shall yield, and the true intention shall prevail.

2. Did the parties mistake the legal effect of the verdict in this case? The verdict sets up as a *will*, a part of the 14th item of the will of 1845, giving certain land and negroes to the children of Cincinnatus Lucas, and then declares an intestacy as to the rest of the estate. This gives the land and negroes *as the will* gives them; that is, from the time of the testator's death, with the natural increase of the negroes from that time, and with eight thousand dollars of rent and hire which had accrued between that time and the time of the settlement. The explanatory paper excepts the natural increase of the negroes from this effect of the verdict, but is silent as to the rent and hire. The verdict, therefore, gives the Lucas children the land and negroes named in that part of the will which is set up, together with the rent and hire. Now, we think it is perfectly clear that the settlement which was *intended* to be carried out by this verdict, gives these children only the land and negroes as they stood at the time of the settlement, without any precedent rent or hire. The history of the negotiation, as given by all three of the negotiators, proves this beyond all doubt. Mr. Trippe opened the negotiation by offering Mr. Hill a round sum of twenty thousand dollars for the Lucas children. Mr. Hill rejected the offer, and made a proposition of his own, which was very much discussed and finally accepted by the other side. The question, What was that proposition? covers the whole dispute. It is important to remark, that it covered the whole estate of which this rent and hire were a known part—giving a certain specified part to the Lucas children, and all the rest of it, without specification, to the heirs at law. Under this proposition, there cannot be an absence

of intention as to *any part* of the estate. Under it, the rent and hire were *intended* to go either to the Lucas children or to the heirs at law, and to the heirs at law for lack of specification, unless *intended* to be included in the specification of what goes to the children. It is a division of a whole consisting of many parts, by carrying certain parts over a line for one set of persons, and leaving the remainder for another set of persons. The intention is to divide the whole, and whatever is not intended to be carried over the line, is intended to be left. The only question, then, is, What was intended to be included in that part of Mr. Hill's proposition which was for the benefit of the Lucas children? He says the terms of his proposition were, that he would take the land and negroes *under* the 14th item of the will of 1845. Now, the legal effect of these terms, in which he says he communicated his proposition, is undoubtedly to carry the land and negroes *as the will* gives them; that is, from the time of the testator's death; but it is demonstrable from the discussion and treatment of this proposition by the negotiators, Mr. Hill included, that he himself did not *mean* so. They all discussed it, went into a valuation of it, and agreed to it, *as* a proposition embracing only the land and negroes mentioned in the 14th item, as they stood at the *time of the negotiation.* They valued the land and negroes at twenty-two thousand dollars, as they stood at the time, and they were valuing them *as embraced in the proposition.* They therefore treated and considered the proposition as embracing the land and negroes only as they stood at the time of the negotiation. This of itself is a conclusive view as to what both sides intended by the proposition. But again: When the valuation had been made, Mr. Hill urged the other side to accept his proposition, *because* it exceeded theirs by only *two thousand dollars;* that is to say, it embraced nothing but the land and negroes valued at twenty-two thousand dollars. The proposition, considered as embracing the *corpus* only of the land and negroes, did exceed the other by precisely two thousand dollars, and he, by telling them that it exceeded the other by no more than two thousand dollars, assured them that it embraced no more than the *corpus* of the land and negroes. If it had embraced the rent and hire, it would have exceeded the other proposition by, not two, but *ten* thousand dollars. The negotiators talked about it, estimated it, con-

sidered it, treated it, and *agreed* to it as embracing only the *corpus* of the land and negroes named in the 14th item of the will of 1845, and as *not* embracing either the preceding natural increase of the negroes or the preceding rent and hire. Mr. Hill says it never occurred to him to get rent and hire. Messrs. Trippe & Poe say that they conceded the *corpus*, and *no more.* There is no conflict, the evidence is all one way, and it shows irrefragibly that these negotiators arrived at an agreement to settle the whole estate by giving the Lucas children the *corpus* only of the lands and negroes. Did they afterwards depart from that agreement? It is true, they made a subsequent agreement as to the *mode* of carrying out the main one, but the subsequent agreement was only ancillary to the first, intended, not to vary it, but to *carry it out.* In the subsequent negotiation respecting the proper mode, Messrs. Trippe & Poe gave the strongest proof that they intended to sanction no departure from the agreement already made, and that they held the mode *subordinate* to the end. This verdict, as it now stands, was proposed as the best mode of carrying out the agreed setlement. After it had been discussed somewhat, they discovered that, in that form, it would carry the preceding natural increase of the negroes. Mr. Hill insisted that he should have the verdict in that form, with its *legal effect,* whatever that might be, but Messrs. Trippe & Poe promptly and peremptorily repudiated the idea of allowing any legal effect which should concede more than they had already agreed to. They said they would not concede a dollar more, and Mr. Hill yielded. They adhered, however, to the verdict, but prevented its legal operation on the preceding natural increase of the negroes, by a clause in the explanatory paper. This natural increase was small in value, and this incident in the negotiation shows at once how resolute Messrs. Trippe & Poe were, not to concede any more than they had already agreed to concede, and that they considered the natural increase of the negroes to be an enlarged demand on Mr. Hill's part. The departure which was about to be made from the agreement in respect to the natural increase of the negroes was seen and prevented. The departure which was made in respect to the rent and hire is discovered now, and ought to be corrected.

3. And this brings us to the remedy. There is no effort here to *reform* an agreement nor to *enforce* one. A bill in

equity would be necessary for that purpose. The Court, in this case was simply asked to recall the aid which itself had lent to the consummation of a mistake.‏ It was asked to set aside its own verdict, because it was not truly an *agreed verdict*, as the Court supposed it to be when it was signed. Suppose the mistake in this verdict had been discovered before it was signed, and Messrs. Trippe & Poe—as they undoubtedly would have done—had objected to its being signed, would the Court have ordered it to be signed as an agreed verdict, over the protest of one of the parties to it? Surely not ; and for the reason that it would not have been an agreed verdict, and would have had nothing to support it. And for the same reason, the Court ought to have recalled its own act in having it signed as an agreed verdict, when it was discovered to have had nothing to support it but a *mistake*. Suppose the verdict had contained *words* which one of the parties did not know were in it, it would not have been an agreed verdict, and would have been set aside immediately upon the discovery that it was not so. So when it contained an *idea* which one of the parties did not know was in its words, it was not an agreed verdict, and ought to have been set aside. This motion to set aside and reinstate was, in effect, a motion for a new trial, and gave the Court the same power over the verdict. When a new trial is moved within time, as this was, it is a form of proceeding under which the Court may inquire into any cause which shows that the verdict was obtained by fraud or mistake, or is without foundation to support it. The whole argument on the remedy in this case is embraced in the statement that this motion only asks the Court to set aside its own mistaken verdict, and does not ask the reformation or enforcement of any contract.

4. The children of Cincinnatus Lucas are not heirs at law of Littleberry Lucas, and have no interest in this verdict, except as legatees under the will of 1845. Of that will, Mr. Cincinnatus Lucas, the defendant in error here, is the nominated executor and propounder, and the motion to set aside this verdict is but a part of the litigation involved in conducting the *caveat* to a final adjudication. We cannot doubt that the nominated executor and propounder of a will is the legal party, in behalf of the will and those who claim under it, to conduct the litigation of a *caveat* from the beginning to the end of the chapter. It was intimated that while

he might litigate for the legatees, he could not bind them by his compromise. It is enough to say that our judgment in this case does not bind them by his compromise, but turns them loose from it. We think the verdict ought to have been set aside, on condition that the defendant might prevent it by entering on the minutes of the Court a renunciation of the rent and hire, which are carried by the terms of it as it now stands. We send the case back for it to take that course.

Judgment reversed.