116　915
s119　631
116　915
123　375

ATLANTA TRUST & BANKING COMPANY *v.* NELMS *et al.*

1. A person vested with the legal title to land, but who is unauthorized to act for another having an equitable interest therein, can not, by a contract to which the latter is not a party and to which he in no way assents, create in favor of one of his creditors, as such, a lien on his interest in the property.

2. Mere ignorance of law on the part of one who, with full knowledge of all the facts concerning a given matter, voluntarily takes steps with regard thereto which operate to his prejudice, affords no ground for granting him relief against the consequences of his own folly, though he may in good faith have labored under a misapprehension as to the legal effect of the course he elected to pursue.

Argued December 16, 1902. — Decided January 9, 1903. Rehearing denied January 22, 1903.

Petition for injunction. Before Judge Lumpkin. Fulton superior court. November 14, 1902.

*Dorsey, Brewster & Howell,* for plaintiff.

*John L. Hopkins & Sons, Lavender R. Ray, W. R. Hammond,* and *R. O. Lovett,* for defendants.

LITTLE, J. The present case is in renewal of the litigation instituted by the Atlanta Trust & Banking Company against Nelms, as sheriff, and others, with which this court dealt at its March term, 1902. See 115 *Ga.* 53. The facts then brought to light were, in brief, as follows: One Morris sold to L. R. Ray a tract of land, taking notes for a portion of the purchase-price, and giving to him a bond for title. Subsequently J. H. James purchased from Ray one half of this tract, and an arrangement was made with Morris whereby James was to get title to the portion he bought. The banking company, hereinafter designated as the bank, afterwards loaned Ray $1,500, taking, as collateral security for the payment thereof, an assignment of his interest in the bond for title. Still later, Morris discounted at the bank the purchase-money notes he had received from Ray, at the same time delivering to the bank in escrow a deed to Ray covering so much of the land as he had not sold to James. To further secure the payment of the notes discounted, Morris also made to the bank a quitclaim deed to that portion of the land just referred to, which deed was "conditioned to be void on the payment of the purchase-money notes by L. R. Ray." These notes were subsequently paid off in full. It was, however, "agreed between Morris, Ray, and the bank, that the

deed to Ray, left in escrow, should not be delivered," but "should so remain in escrow until the indebtedness" of Ray to the bank, arising out of its loan to him of the $1,500, was fully discharged. This indebtedness was never in fact paid, and the bank reduced its claim against Ray to judgment. Desiring to levy the execution issued upon this judgment on Ray's interest in the land, the bank then "proceeded, as it supposed in the proper method, by filing in the clerk's office the deed which Morris had executed and deposited in escrow with" the bank, to enforce the collection of its judgment. It became the purchaser at the sheriff's sale made under a levy of its execution on the land covered by that deed. It bid off the land in ignorance of the fact that there were a number of outstanding judgments against Ray held by other creditors, and "expected that the amount bid would be credited on its said fi. fa." These judgment creditors claimed the proceeds of the sale, and the bank instituted an equitable proceeding whereby it sought either to be relieved from the obligation of complying with its bid, or that it be decreed to be entitled to assert, as against these creditors, an equitable lien upon the funds realized from the sale of the land. In view of the facts just recited, this court held (1) that the bank could not escape from the operation of the rule of caveat emptor, but was bound to comply with its bid ; and (2) that it had neither a legal nor equitable lien upon the proceeds of the sale. In support of the latter proposition, it was pointed out that, according to the terms of the quitclaim deed which Morris gave to the bank, its title to the land was to become divested immediately " on the payment of the purchase-money notes by L. R. Ray," and that its agreement with him that Morris's deed to him should "remain in escrow" until he paid his indebtedness to it for money borrowed amounted to no more than a mere deposit of a bare muniment of title to which the bank was a stranger.

The bank now predicates its claim to equitable relief upon the following allegations: After Morris had parted with the purchase-money notes given for the land, by procuring the bank to discount the same, he " desired to secure the bond for titles which he had given Ray, and which Ray had transferred to petitioner; but petitioner, of course, declined to surrender the same until it had received all the money which Ray owed it." This being the situation, " Morris suggested that he would make petitioner a deed to

the land covered by the bond, and which was not included in that sold to James, to be defeasible on Ray paying the two notes held by petitioner, to wit, one which Morris had discounted to petitioner, and the other which Ray had given petitioner for the borrowed money, and execute a deed to Ray to the said land and place it in petitioner's possession, to be delivered to Ray when Ray had fully paid petitioner the amount due on said two notes. This suggestion was submitted; and, after considering the same, it was decided by said Morris and petitioner that legally the arrangement would secure petitioner just as efficiently as the bond for titles; in other words, it would bind the land to the payment of the amount due it by Ray in the same way that the bond for titles had secured it; and it was therefore then and there agreed between petitioner and said E. S. Morris that Morris should make a deed to petitioner to said land, defeasible on Ray paying petitioner the amount due it on said notes, and place in petitioner's hands a deed to said land to Ray, to be delivered to Ray when Ray should have fully paid off said two notes, and when the deed made to it had thereby become void. This was the agreement which was made by E. S. Morris and petitioner, and the same was to be put in a proper form, and, when duly executed, petitioner was to surrender its bond for titles which Morris had given to Ray, and which Ray had transferred to petitioner. Having reached this agreement, the preparation of the papers was entrusted to some employee of the bank, or scrivener, but whom petitioner can not now recollect. The papers were duly prepared, and Morris signed up the deeds and petitioner surrendered the bond to Morris." When this transaction took place, the "said Morris and petitioner both believed said defeasance deed recited both notes which petitioner held, and petitioner accepted the same so believing, and it was their intention, when it was signed and accepted, that both notes should be embraced in its terms; and if it had been known at the time that both notes were not included, the same would have been made to include both, as such was the intention, and it was believed to so embrace them when signed, delivered, and accepted." In point of fact "the deed made by Morris to it did not embrace but one note," but this was not known to the bank "until after litigation grew up, when it discovered the defeasible deed did not specify the note it held on Ray for the money he had borrowed, but only the note which

it had secured by discount from Morris." This deed does not, therefore, " express the contract made by it and Morris," nor carry out their intentions in the premises. The " arrangement by which the bond for title was surrendered and said deeds were made was not intended by said E. S. Morris or petitioner to in any way affect petitioner's security for the indebtedness which L. R. Ray owed it. The only purpose was to enable Morris to get up his bond which was held by petitioner, and at the same time not to affect petitioner's security on the land. This was the intention which Morris and petitioner had, and to carry this purpose into execution they both were firmly convinced and believed: (1) That said Morris could make a defeasance deed to said property to petitioner, to be good and valid until the payment by Ray of said two notes, and, on their payment, such deed to become void. . . (2) That if Morris would make a deed to Ray and place that deed in possession of petitioner, with expressed conditions that it was not to be delivered to Ray until he, Ray, paid petitioner the note it held by discount, as well as the other note Ray owed petitioner for borrowed money, the title could not vest in Ray until the deed was delivered on the performance by him of said conditions." If, however, " said arrangement as to the last proposition vested title in said L. R. Ray to said property and released it from the claim which petitioner undoubtedly had while holder of said bond, the result which followed said deposit of said deed with petitioner was not intended, and the same was a mistake as to effect of said action by Morris and petitioner upon the claim of petitioner, which mistake has resulted in great injustice to petitioner and to the advantage of his (Ray's) creditors, which in equity and good conscience said creditors have no right to insist upon, because the same would be inequitable and unjust to petitioner." Moreover, "if the legal effect of said arrangement was not such as was intended by the parties, but the same had the effect to place the title in Ray and displace the claim of petitioner to said property as security for the debt which Ray owed petitioner, and leave petitioner without any security therefor, the result would be that petitioner would lose its debt altogether, because said Ray is totally insolvent and was so at the date of said arrangement." His other judgment creditors are not entitled to any preference over petitioner, for credit was not extended by them on the faith of his ownership of the land in

question, but his indebtedness to them was contracted and " existed prior to the date of said contract and agreement between Morris and petitioner." At the time petitioner filed in the office of the clerk of the superior court the escrow deed from Morris to Ray, in order to have Ray's interest in the land subjected to its execution against him, it believed that "the defeasance deed made by Morris to petitioner contained the agreement which had been made," whereby it was induced to surrender the bond for title. Petitioner also " made and had recorded a quitclaim deed to said property," in which Ray was named as the grantee, and which recited that it was " executed and filed for the purpose of levy and sale." This " quitclaim deed was made and recorded for no other purpose than to enable petitioner to have said property levied on and sold to pay " Ray's indebtedness to it for borrowed money. Petitioner had no knowledge of any outstanding fi. fas. against Ray, and when the land was sold by the sheriff, " it bid for said property, believing that the proper legal construction of Morris's making said deed to Ray and putting the same in petitioner's possession, to be delivered to Ray when he should pay said two notes, constituted a legal escrow, and that it would not be required to pay money for said property ; and but for such belief, it would not have bid for said property, or had said property sold under its fi. fa. at that time," but would have waited " until it had the mistake corrected in said defeasance deed." Petitioner's " bid for said property was' the result of being misled by the mistake which had been made of the legal effect which resulted from the making of the said deed by Morris to Ray and placing it in the possession of petitioner to be delivered to Ray on the payment of said two notes." To hold that the agreement between petitioner and Morris would, if carried out as contemplated, have the opposite legal effect from that intended, " that is, the effect of defeating the very purpose the parties had in view," would be to allow the other judgment creditors of Ray to take " an unconscionable advantage of the mistakes made by Morris and petitioner" in entering into the arrangement above set forth.

The petition filed by the bank also contained various argumentative conclusions by the pleader, to the effect that the rights of no party to the litigation would be injuriously affected by a decree that petitioner had an equitable lien upon the proceeds of the sale,

etc., etc., and accordingly, it ought not to be required to do more than credit upon its fi. fa. against Ray the amount of its bid. Petitioner prayed, (1) that "the defeasance deed be reformed and made to express the intention of the parties thereto, by inserting therein, in addition to the note which Morris had discounted, the note which Ray had given petitioner for the borrowed money;" (2) that the sheriff "be required to enter on petitioner's fi. fa., as a credit, the amount of its bid, less the costs, and make and deliver to petitioner a sheriff's deed to said property," and also that he be enjoined from prosecuting against petitioner a suit commenced in the city court with a view to compelling petitioner to pay in cash the amount of its bid; (3) that the judgments owned by creditors of Ray who were parties defendant to the action be decreed to be "of inferior dignity" to petitioner's claim against him, and "not, therefore, entitled to the proceeds of said sale;" (4) that the court decree that the deed made by Morris to Ray, "and placed in the possession of petitioner to be delivered to said Ray when he should pay the two notes due petitioner, was an escrow and passed no title to said L. R. Ray;" and (5) that it be further decreed that the recording of such deed in the office of the clerk, and the sheriff's sale agreeably thereto, "did not have the effect to destroy the superiority of the lien of petitioner on the said property," but that petitioner is entitled to claim "the proceeds of the sale of said property." The petition concluded with prayers for the following alternative relief, in the event the court should hold that petitioner was not entitled to that sought by the prayers just recited: That the above-mentioned contract between Morris and the bank "be set aside, and the deed executed to the said property by E. S. Morris to L. R. Ray be redelivered to said E. S. Morris, and the record thereof be cancelled." Also, that "the quitclaim deed made and recorded by petitioner to L. R. Ray be cancelled and the record thereof be cancelled; that the bond for titles which petitioner surrendered to said E. S. Morris be returned to petitioner, and the status quo, as it existed on the date of said contract, be re-established." Further, that "Morris be decreed to execute and deliver to petitioner good and sufficient titles in fee simple to said property, as required by the terms of said bond, and upon so doing, petitioner surrender said bond duly cancelled." Still further, that "petitioner have a decree in its favor declaring its claim to said

property, as security for the amount of said judgment, superior to the lien of said judgment creditors;" that the property be "decreed sold, and the proceeds of such sale be applied first to the payment of the amount due on said judgment, principal and interest;" and, further still, that "petitioner have such other and further relief, the premises considered, as may to the court seem meet and proper."

To this petition Nelms, the sheriff, and two of the defendants, who were judgment creditors of Ray, demurred on various grounds, one of these grounds being that "said petition shows that the mistakes asked to be corrected are not such mistakes as are relievable in equity," and another ground being that the "reasons given in said petition for the reformation of the deed requested are insufficient to warrant such reformation," petitioner having "slept over whatever rights it may have had in the premises, and [having] been guilty of such laches and want of diligence as to forever bar its entrance to a court of equity for the purpose of reforming" that instrument. In order to meet this charge of laches, the bank offered an amendment to its petition, the purpose of which was to explain why earlier steps in the premises had not been taken. The trial judge refused to allow this amendment to be filed. In passing upon the alleged right of the petitioner to the injunction prayed for, upon which a hearing was had in the court below, his honor declined to grant the same. To both of these rulings the bank excepted, and brought the case to this court for review.

1. It may, for the purposes of this discussion, be conceded that the bank was guilty of no laches in accepting the defeasance deed to it as written, and was, as between it and Morris, entitled to have the deed reformed so as to express the real agreement entered into by them. Indeed, we may regard this reformation as having already taken place, so far as they are concerned, or we may treat the deed as originally setting forth a stipulation to the effect that it should not become inoperative until Ray had paid to the bank the money borrowed, as well as the purchase-money notes held by it, and that he was not entitled to a delivery of the deed in which he was named as the grantee, and which was placed in the possession of the bank as an escrow, until he had satisfied in full all claims which the bank held against him. It is to be observed, however, that there is no claim on the part of the bank that Ray was a party to the contract between it and Morris, or that Ray

ever at any time assented to the arrangement whereby a deed in escrow was to be made to him by Morris, to be delivered only in the event the money borrowed from the bank should be repaid, and. whereby the bond for title was to be surrendered to Morris upon his making to the bank the defeasance to it. It certainly was not within the power of Morris, a mere vendor of soil, to create in favor of the bank, as a creditor of Ray, a contract lien on the land he had purchased. Neither Ray nor his other creditors could be bound by any such arrangement, since neither the bank nor Morris was the authorized agent of Ray. Nor can a court exercising equitable jurisdiction reasonably be expected to overlook this fact and lend its countenance to any such change in the status quo as was attempted by Morris when he undertook, independently of the will of Ray, to create in favor of the bank, as his creditor, a contract lien, binding alike on him and his creditors, to take the place of the protection afforded the bank by the bond for title which Ray had assigned to it as collateral security. This being so, the bank would not be in a position where it could set up any lien on the proceeds of the sheriff's sale, even had the defeasance deed made to it by Morris correctly evidenced the contract into which they entered; and it necessarily follows that a reformation of that deed could not possibly now benefit the bank in any way.

It may not be amiss to state, in this connection, that we are not to be understood as intimating a doubt that a defeasance such as that which the bank and Morris had in contemplation would be effectual in preventing the deed in which Ray was named as grantee from taking effect so soon as he had paid in full the purchase-money notes he had given for the land. On the contrary, the idea we mean to convey is this: As the grantee named in such a defeasance deed, the bank would hold the legal title to the land under Morris — not under Ray or by his consent, but adversely to him as the privy in estate of Morris, its sole grantor. One holding land under an adverse title, and not under another or with his assent, is not in a situation to assert that the latter has pledged the legal title as security for a debt, for such is not true as matter of fact.

2. In its petition the plaintiff virtually recognizes that the instrument sought to be reformed, had it originally been framed as contemplated by the parties thereto, would not have had the legal

effect of creating any lien on the land brought to sale under its execution. The pleader says, in this connection: Petitioner's "bid for said property was the result of being misled by the mistake which had been made of the legal effect which resulted from the making of the said deed by Morris to Ray and placing it in the possession of petitioner to be delivered to Ray on the payment of said two notes." The bank, however, sets up the plea that to hold it bound by this mistake of law on its part would result in great hardship upon it, by giving to other judgment creditors an advantage which they could not have gained if such unfortunate mistake had not been committed. In other words, the bank insists that it is equitably entitled to be relieved from the consequences which flowed from its mistake of the law in entertaining the idea that it was within the power of Morris to bind Ray and his creditors by a contract to which he was not a party, designed to afford the bank the same protection afforded to it by the bond for title which Ray had pledged to it as security for the payment of the loan made to him. The bank took an erroneous view of the law in supposing that such a contract would give to it a preference over other creditors of Ray, who was at the time hopelessly insolvent, and the action it took under that view was entirely voluntary.

On the argument here, counsel for the plaintiff in error contended that a creditor is, in equity, entitled to be relieved from the consequences of his voluntary acts, when it appears, as in the case at bar, that, solely because of a misapprehension, on his part, of the law of the land, he in good faith pursues a line of conduct which, instead of inuring to his benefit, as he expected, by giving him a preference over other creditors of his debtor, has the legal effect of placing them in a more advantageous situation than they would have occupied had he taken the proper steps to subserve his interests. In support of this contention the following cases were cited and relied on: *Culbreath* v. *Culbreath,* 7 *Ga.* 64; *Wyche* v. *Greene,* 16 *Ga.* 49; *Adams* v. *Guerard,* 29 *Ga.* 651; *Lucas* v. *Lucas,* 30 *Ga.* 191; *Collier* v. *Perkerson,* 31 *Ga.* 117; *McCrary* v. *Austell,* 46 *Ga.* 450; *McCallum* v. *Brandt,* 48 *Ga.* 439; *Langston* v. *Aderhold,* 60 *Ga.* 376; *Werner* v. *Rawson,* 89 *Ga.* 619; *Bohler* v. *Verdery,* 92 *Ga.* 715; *DuBignon* v. *Brunswick,* 106 *Ga.* 317; *Woodside* v. *Lippold,* 113 *Ga.* 877. A casual examination of the rulings made in these cases will suffice to show

that while this court has consistently recognized that relief against mistakes of law, as well as mistakes of fact, may under certain circumstances be granted by a court of equity, in no instance has this court held 'that such relief can be granted to a party who, like the plaintiff in error, offers no better excuse for his failure to take proper steps to protect himself than that he was ignorant as to the law and supposed he would acquire an advantageous position by voluntarily doing precisely what he ought not to have done in attempting to gain and preserve a preference.

Only one of the above-cited cases need be specially noticed, that of *Collier* v. *Perkerson*, in which the following facts appeared : One Hodge gave to Collier a mortgage on land owned by Hodge, to secure the payment of a note for six hundred dollars. Subsequently several judgments against Hodge were obtained by one of his creditors, and the fi. fas. issued thereon were levied on the land. "When the property was exposed to sale by the sheriff, notice was publicly given that the same would be sold subject to the mortgage lien of the said Collier, and at the sale, the said Collier being the highest and best bidder, the property was knocked off to him at the price of nine hundred and thirty-one dollars. Immediately after the property was knocked off, the said Collier stated that he had bid for the same under a mistake; that he thought that the money arising from the sale would first be applied to the payment of the sum due on his mortgage, and the balance to the judgment creditors; but upon being informed that he could claim no part of the money on his mortgage, he declined taking the property and stated to the sheriff that he could sell it over again, as he, Collier, had bid for it under a misapprehension of his rights. The property was forthwith sold again, and purchased by" another bidder, who had previously been laboring under the same mistake as to the interest in the property offered for sale, "at and for the sum of three hundred and seventy-five dollars." This latter amount represented the full value of the land, taking into consideration the mortgage lien thereon. The sheriff brought a suit, for the use of Hodge, the owner of the land levied on and sold, to compel Collier to pay the difference between his bid and the amount for which the property was knocked off at the second sale. It appears that Collier himself made the public announcement, given before the land was offered for sale, that it would be sold subject to his mortgage lien.

His purpose seems to have been merely to give notice that he held a lien on the land and expected to claim the proceeds of the sale, as against other creditors. The language he used in giving this notice was such as to indicate an altogether different intention than that he had, which was to let the land sell for all it was worth and to look to the proceeds for payment of his mortgage; but no one was misled thereby, for as soon as Collier became aware that his purpose in making his announcement and in bidding for the land was not understood by the sheriff and the other persons present at the sale, he corrected the erroneous impression he had created, by making this announcement to them, and requested the sheriff to again offer the land for sale upon the same terms as that officer had undertaken to dispose of it. "The second sale occurred before the sheriff left the block, and before any of the bidders had gone away from the place of sale;" so none of the persons attending the sale were deprived of an opportunity of bidding for the land upon those terms; and, as it was forthwith sold for all it was worth as incumbered by Collier's mortgage lien upon it, he was not estopped, the court in effect held, from asserting, as against Hodge, who sought to take an unconscionable advantage of the mistake made by Collier, that he had not intended by his announcement to give notice of an election on his part not to look to the proceeds of the sale for payment of his mortgage, but to have the land brought to sale subject thereto. Judge Jenkins, who pronounced the opinion of the court, characterized the misapprehension under which Collier acted as a mistake of law. Technically speaking, it is doubtless true that he committed a mistake of law, rather than one of fact, in misconceiving the legal purport of his announcement that the land would be offered for sale subject to his mortgage. In other words, he appears to have been ignorant of the significance which the courts and all persons versed in the technicalities of the law attach to such an announcement, under such circumstances. But when Collier bid $931 for the land, believing it was being offered for sale free from the lien for $600 created by his mortgage, he unquestionably labored under a mistake of fact in supposing that the sheriff and all others present understood his real purpose in making the announcement just referred to, and that accordingly he had been invited by the sheriff to bid for, and would be able to get, an unincumbered title to the land. This was as much a mistake of

fact as would be the erroneous impression of a bidder at public out-cry that the property offered for sale was a five-gallon milch cow, instead of a year-old heifer. Taking into consideration the facts upon which the decision in the case under discussion was based, Collier was clearly entitled to the relief afforded him.

The case now before this court presents an altogether different complexion. The bank voluntarily parted with the bond for title it held as security, thereby committing the mistake of law that it could safely do so. Its mistake consisted in erroneously supposing that one person has authority, without the assent of another, to create by contract a lien upon his property in favor of his creditor. The bank, of its own volition, filed in the office of the clerk of the superior court a quitclaim deed to the land conveyed to it by Morris, as well as his deed to Ray which it held in escrow, intending that the legal title to the land should pass to the purchaser at the sale it caused to be made under a levy of its execution. It made a mistake of law in supposing that it had a superior lien on the land which, by statutory operation, would immediately, upon its sale freed from such lien, be transferred to the proceeds realized there-from; and that, therefore, it (the bank) could without prejudice, by filing with the clerk the deeds just mentioned and directing the sheriff to levy its execution on the land, divest itself of all title it had thereto and have the land sold, wholly unincumbered by any lien in its favor, as the property of Ray. In its petition the bank admits it would have committed precisely the same mistake had the defeasance deed made to it correctly evidenced the contract between it and Morris; so the fact that this deed was not framed as intended in no way influenced the conduct of the bank in bring-ing about the sale of the land free from any claim of lien it had thereon. The bank acted under a misapprehension of the law in sup-posing that contract would afford it the same protection as did the bond for title it surrendered to Morris, thus relieving him of the obligations he had assumed thereunder, so far as the bank was con-cerned. It bid off the land fully expecting that, as the purchaser thereof, it would acquire the unincumbered legal title thereto, and that, in its capacity as a creditor of Ray, it could successfully as-sert that as it had caused the land to be sold free from its claim of lien, instead of subject thereto, the same was, by operation of law, transferred to the proceeds realized from the sale, and therefore a

preference in its favor was thus created over all other claimants of the fund, and it could insist upon being allowed to credit the amount of its bid upon its execution. Undoubtedly the bank, as the highest and best bidder at the sale, acquired all the interest Ray had in the land, unaffected by any claim of lien which it, as his creditor, may previously have asserted. But as the bank, as such creditor, did not, in point of fact, hold any valid lien upon Ray's interest in the land, at the time it took steps with a view to placing the legal title in him, in order that it might pass to the purchaser at the sale, there was nothing upon which the statute could operate ; and accordingly it could hardly be expected to create, by transfer, any lien in favor of the bank upon the funds realized from such sale. Lastly, the bank, when it instituted the present proceeding, committed a mistake of law in supposing that the trial court could, without doing violence to the law as expressed in the Civil Code, § 3978, grant the relief prayed for in its petition. That section reads as follows: " Mere ignorance of the law on the part of the party himself, where the facts are all known, and there is no misplaced confidence, and no artifice or deception or fraudulent practice is used by the other party, either to induce the mistake of law or to prevent its correction, will not authorize the intervention of equity." That the law, as thus announced, precludes the plaintiff in error from successfully prosecuting the present action, seems manifest. The condition in which the bank now finds itself is due solely to the fact that its claim against Ray has not been properly handled, if its purpose was to preserve the security it originally had.

The case of *Woodside* v. *Lippold*, 113 *Ga.* 877, affords an instance of where equitable relief was denied to one who, knowing of the existence of a mortgage lien, " but acting under the misapprehension, for which the holder of the . . mortgage was in no wise responsible, that he would not insist upon the enforcement of the same," lost the protection afforded by a senior mortgage, by committing the folly of permitting it to be marked satisfied and cancelled of record. When dealing with the case reported in 115 *Ga.*, which was brought to this court by the Atlanta Trust and Banking Co., Mr. Presiding Justice Lumpkin took occasion to remark (page 59) that " the bank was not an immune with respect to the operation of the doctrine of caveat emptor, which applies to sheriff's sales. It bid off the land just as any other purchaser

would have done, and was, under that doctrine, liable for the amount of its bid without regard to the question whether its execution, or others of superior dignity, were entitled to the fund raised by the sale." He further said (page 62), in discussing the alleged right of the bank to claim the proceeds of the sale, on the idea that it had an equitable lien thereon: "When the bank voluntarily gave up its right to redeem the land under" the bond for title which had been assigned to it by Ray, but which it surrendered to Morris when he made to it the defeasance deed, "it became a mere unsecured creditor holding a naked muniment of title. Neither Ray nor his other creditors could enforce delivery of the escrow deed until the $1,500 debt had been paid, but at the same time the bank had no legal or equitable right to surrender this deed or file it with the clerk of the superior court for the sole purpose of allowing a sale under its own execution to the exclusion of other executions. If the delivery of the escrow deed to the clerk had any effect at all, it effectually passed the Morris title into Ray for all general purposes, and all judgment liens against Ray immediately attached. Swann held a lien of higher dignity than that afforded by the judgment against Ray in favor of the bank, and there is no reason in law or equity why he should not be allowed to claim the proceeds of the sale. The embarrassing situation in which the bank finds itself was not caused by anything which Swann did or failed to do, but is attributable solely to its own voluntary acts." In referring in this opinion to the rulings made in the case last mentioned, we are not to be understood as placing our present decision, in whole or in part, upon the doctrine of res adjudicata, for on the hearing in the court below this doctrine seems not to have been invoked as affording a reason for denying the injunction. We merely cite that case, as though it were an unfriendly controversy between strangers to the present proceeding, with the view to calling attention to past adjudications by this court bearing on the questions now presented for decision.

*Judgment affirmed. All the Justices concurring, except Lumpkin, P. J., absent.*