ATLANTA TRUST & BANKING CO. v. NELMS, sheriff et al.

1. It is not erroneous to deny an application by a plaintiff to make another person a party to a pending case, when no sufficient reason therefor is set forth ; and the more especially is this so when the application, besides being bad in substance, is attacked by a good special demurrer which is not met by appropriate amendment.
2. The mere deposit of a bare muniment of title to land as security for a loan does not put title thereto in the lender, or create a lien in his favor on such land.
3. Under the facts of the present case, the lien actually held by the plaintiff in error upon the land sold by the sheriff was inferior to that of the contesting judgment creditor whose execution was placed in the sheriff's hands to claim the proceeds of the sale.
4. Though the holder of an execution, under which property is about to be sold, be, before the sale, informed by the levying officer that there is no other execution in his hands to claim the proceeds of the sale, yet if, after the property is sold to such holder, an execution founded upon a judgment of superior dignity to that upon which his execution was issued be placed in the officer's hands prior to a settlement between him and the purchaser, or a timely offer by the latter to comply with his bid, he can not be relieved therefrom merely because, by reason of the information received before the sale, he bid off the property solely for the purpose of having the proceeds of the sale, less expenses and costs, credited upon his execution, and would not, in the absence of such information, have become the purchaser at all. The decision in the case of Glenn v. Black, 31 Ga. 393, bearing upon a similar question, will not be extended beyond its own peculiar facts.

Argued February 20,—Decided April 1, 1902.

Money rule. Before Judge Lumpkin. Fulton superior court. June 29, 1901.

Hunt & Golightly, Westmoreland Brothers, and Dorsey, Brewster & Howell, for plaintiff. John L. Hopkins & Sons, W. R. Hammond, and L. R. Ray, for defendants.

LUMPKIN, P. J. The Atlanta Trust and Banking Company, hereinafter called the "bank," filed in the superior court of Fulton county a petition for a rule against J. W. Nelms as sheriff. The material allegations of this petition were: On the 3rd day of May, 1898, the bank obtained a judgment against Lavender R. Ray, in

the superior court of Douglas county, for $1,791.33, besides interest and costs.    An execution issued upon this judgment was thereafter levied on certain realty as the property of the defendant in execution, and the property was sold by the sheriff to the plaintiff in execution.    It thereupon directed the sheriff, after deducting expenses and costs, to apply the balance to the execution under which the property had been sold.    This the sheriff refused to do, on the ground that other executions had been placed in his hands, claiming the proceeds of the sale.    These executions are not entitled to priority over plaintiff's judgment.    The petition concludes with a prayer that the sheriff show cause why he should not apply the proceeds of the sale to the petitioner's execution as requested.    To this proceeding James Swann and Mrs. S. A. Melson were made parties.    Before the case reached a final hearing the plaintiff filed several amendments to its petition.    The last of these was allowed April 16, 1901.    This amendment embraced a prayer that Mrs. Anna F. Ray, the wife of the defendant in execution, be made a party to the pending case, that an equitable petition which she, prior to the date of the sheriff's sale, had instituted against the plaintiff, seeking an injunction against that sale, be consolidated with the pending rule, and that both cases be tried together and wound up by a judgment fixing the rights of all the parties.

The case made by all of the plaintiff's pleadings, reference being here had to the original petition and all the amendments thereto, was in substance as follows:    On February 20, 1891, Lavender R. Ray contracted to purchase from E. S. Morris certain described real estate in the county of Fulton.    By the terms of the contract Ray agreed to pay for the land $7,000 — $1,200 in cash and the balance in three installments to become due on the 20th day of February in the years 1892, 1893, and 1894, respectively.    In pursuance of this agreement Ray made the cash payment, gave promissory notes to Morris, and took from the latter a bond for title. On the 20th day of April, 1892, Ray contracted with J. H. James to sell him one half of the land purchased from Morris, and received from James $3,120 in cash and three promissory notes each for the sum of $1,960, maturing respectively on the 20th day of February, 1892, 1893, and 1894.    In order to carry out this last contract and enable James to secure a title to the portion of the land purchased by him, the bank was constituted trustee, and received the

notes of James to collect the same and from the proceeds thereof pay over to E. S. Morris the amounts due upon the notes he had received from Ray as stated above. Morris executed a deed conveying to James the land purchased by him, and placed this deed in the hands of the bank, "to be delivered when it had collected from James the notes he had given, and the money arising therefrom had been used in paying off the notes held by E. S. Morris and given by Ray." On March 3, 1893, Ray applied to the bank for a loan of $1,500, to secure which he offered the bond which he had received from Morris, "less the half sold to James." The bank made the loan of $1,500, taking Ray's note therefor, "and to secure said note the said L. R. Ray transferred the bond for title given him by said E. S. Morris." "It was agreed, and the agreement made a part of said transfer by being inserted therein, that said bond for title was not only to secure said note of $1,500, but any renewal thereof." After the notes given by James were deposited with the bank for collection, Morris discounted at its office the purchasemoney notes he had received from Ray, and delivered to the bank in escrow a deed to Ray, to that portion of the land which had not been sold to James, and also a quitclaim deed to the bank, "to further secure the notes discounted, to the same tract or parcel of land, conditioned to be void on the payment of the purchase-money notes by L. R. Ray."

James promptly paid his notes, except the last one due February 20, 1894, "which was to pay the note from Ray to Morris." The bank, having paid the latter, extended the time of payment to James, and his last note was in fact paid May 26, 1895. But as Ray had transferred his bond for title from Morris to the bank to secure Ray's note of $1,500 to it, or any renewal thereof, it was agreed between Morris, Ray, and the bank, that the deed to Ray, left in escrow, should not be delivered, "but that said deed so held in escrow should so remain in escrow until the indebtedness due said . . [bank] was paid by Ray, and said . . [bank] should make a bond for title to said Ray, to either deliver said deed, or make a deed to said Ray." This agreement was actually carried into effect, and a deed made by Morris to Ray, and placed in the hands of the bank, remained in its hands, and it gave a bond for title to Ray. Ray has never paid any portion of the indebtedness evidenced by his $1,500 note, but on December 20, 1895, renewed the same, giving

to the bank a new note for $1,791.33, no part of which has ever been paid. "When said purchase-money was finally paid," recognizing that the title vested in the bank, it and Ray, intending to protect all interests, decided it was proper that the bank execute and deliver to him a bond for title, which was done; but, having kept no copy thereof, the bank can not allege with exactness what were its terms and conditions, and can only allege that to the best of the bank's recollection it was an instrument embracing an obligation that on the payment of the said $1,791.33 the bank would deliver to Ray the deed to him which Morris had deposited with the bank in escrow. "But it may have been a bond for title in the usual form. Such instrument was in form one or the other, and by its terms, whether one or the other, it was conditioned that said Ray was to have title only when the said note, or its renewal, had been fully paid." Ray having failed to pay the note for $1,-791.33, the bank brought against him an action thereon, and obtained a judgment, upon which an execution was issued. Desiring to levy this execution upon the land not included in the purchase by James, "it proceeded, as it supposed in the proper legal method, by filing in the clerk's office the deed which Morris had executed and deposited in escrow with the . . . [bank], and had the same recorded as provided by law." The land was exposed for sale by the sheriff and knocked off to the bank for the sum of $1,975. There were, so far as the bank was informed at the time of the sale, no other judgments or liens against L. R. Ray in the hands of the sheriff, and the bank "bought said land in order to satisfy said fi. fa. and pay off said indebtedness, and intended and expected that the amount bid would be credited on its said fi. fa. It did not expect that it would be required to pay any money on its said bid ; but when it proceeded to get a deed and have its fi. fa. credited with its bid, it found that, subsequent to the sale and its purchase, . . several fi. fas. had been placed in the hands of the sheriff, claiming that they had priority over the fi. fa. of the . . [bank], and the sheriff refused to make a deed to the said . . [bank], or credit its fi. fa. with its bid." On September 28, 1894, D. M. Franklin, for the use of James Hughes, obtained in the city court of Atlanta a judgment against Lavender R. Ray as principal, and Mrs. S. A. Melson and John D. Ray as sureties, for the principal sum of $5,347.84, besides interest and costs, and an execution thereon was issued on

the 29th day of September, 1894. Mrs. Ray, the wife of Lavender R. Ray, is the owner of an interest in that execution to the amount of $1,000, by reason of a transfer from the plaintiff therein to her. Mrs. Melson, the sister of Lavender R. Ray, owns an interest in that execution to the amount of $1,800, and James Swann, "the transferee for the plaintiff in fi. fa., and by the consent of Mrs. A. F. Ray and Mrs. M. A. Melson, took an assignment of an interest in said fi. fa. to the amount of $2,026, which was, by consent of Mrs. A. F. Ray and Mrs. M. A. Melson, L. R. Ray, John D. Ray, and the plaintiff in fi. fa., prior and superior to the liens of Mrs. A. F. Ray and Mrs. M. A. Melson." This execution was placed in the hands of the sheriff to claim the proceeds of the sale after the property had been bid off by the bank. If the proceeds of that sale should be applied to the interest of James Swann in this execution, it would be to the benefit of Mrs. Ray, as she would then have the next superior lien of all liens against her husband. For the reason just mentioned the equitable petition of Mrs. Ray against the bank should be consolidated and tried with the case made by this rule. The price paid by the bank for the property at the sheriff's sale was all it was worth, and the bank would not have purchased it at all but for the fact that L. R. Ray is insolvent and, so far as it knows, has no other property subject to levy and sale under any kind of a lien. The prayers of the petition, in addition to that asking that Mrs. Ray be made a party and that her equitable petition be consolidated with the pending case, were, that a judgment be entered " decreeing that she has no title or equity in said described land," and that should it appear that her title thereto is good and that the bank got no title at the sheriff's sale or otherwise, then that it be relieved from paying the amount of its bid into court; but that should it appear that the bank's title is good by reason of the sale, or otherwise, then that the bank may " pay the amount of the bid to be applied as the court may direct in this proceeding."

The plaintiff tendered an amendment to its pleadings, containing the following allegations and prayers: " Immediately before the sale of the property in question, plaintiff applied to the sheriff to know if any other executions against L. R. Ray had been placed in his hands claiming the fund arising from the sale of said property to be sold that day, and the reply was that no executions had been placed in his hands. Immediately after the sale of the property,

plaintiff offered to settle its bid for said property by having it cred-
ited on its execution, after paying expenses of said sale, and take a
deed to said land; and the sheriff refused to do so, saying that after
the sale other executions had been placed in his hands claiming
the money.    Plaintiff says that it had the legal right to have its
said bid, after paying the expenses of the sale, credited on its exe-
cution, and the right to a deed to the property from the sheriff.
Plaintiff further amends by praying leave of reference to the peti-
tion heretofore filed in this court by Mrs. A. F. Ray against this
plaintiff as often as may be necessary.    Plaintiff prays for a judg-
ment crediting the amount of its bid on said property, after paying
said expenses, on its said execution, and that the sheriff be required
to make it a deed to the same, in accordance with said bid, and, in
the event that can not be done, that the sale made by the sheriff of
said property, and which was bid off by plaintiff, be declared void
and of no effect."    This amendment was rejected.    To the amend-
ment of April 16, 1901, Mrs. Ray demurred generally, and also
specially on the ground that while the petition alleged that she had
filed an equitable petition it failed to set forth a copy of the same
and also failed to set forth its substance.    Her demurrer was sus-
tained.    The original petition and also all the amendments were
met by proper demurrers filed in behalf of the other parties to the
case.    All these demurrers were sustained, and the petition was
dismissed.    Thereupon the bank sued out a bill of exceptions, al-
leging error in sustaining all the demurrers mentioned above, and
in refusing to allow the amendment to its pleadings last above cop-
ied.    We will now state and discuss the questions thus made and
presented for our determination.

1. Was the court right in sustaining Mrs. Ray's demurrer to the
amendment of April 16, 1901?    We will first inquire whether the
general ground of this demurrer to that amendment was well taken.
Prior to the time of its allowance she was not a party to the case,
nor, so far as appeared, had any effort been made to bring her into
the litigation.    We gather from the pleadings and the brief of coun-
sel for the plaintiff in error that her presence in the case was de-
sired for two reasons: (1) that she had an interest of $1,000 in the
execution under which Swann claimed, and (2) that she claimed
title to the land sold at the sheriff's sale, and had, prior thereto,
brought an equitable petition against the bank, by which she sought

to enjoin the sale and obtain a judgment that the land was hers. We do not think the fact that Mrs. Ray had an interest in the execution last referred to was any reason for drawing her into the controversy raised by the rule against the sheriff. Swann could enforce this execution only to the extent of his interest therein, and it was certainly the privilege of Mrs. Ray, though she also had an interest in the execution, to elect not to claim any of the proceeds of the sheriff's sale. By her abstaining from so doing the bank in its capacity of judgment creditor was benefited, and therefore could not reasonably complain of Mrs. Ray's allowing a distribution of the proceeds of the sheriff's sale to be made without claiming any right to participate therein. In its capacity of purchaser at the sale the bank had no right to compel Mrs. Ray to become a party to the contest over the distribution of the proceeds thereof; for the bank was not an immune with respect to the operation of the doctrine of caveat emptor, which applies to sheriff's sales. It bid off the land just as any other purchaser would have done, and was, under that doctrine, liable for the amount of its bid without regard to the question whether its execution, or others of superior dignity, were entitled to the fund raised by the sale. The pendency of Mrs. Ray's equitable petition certainly does not, in view of all the facts alleged by the bank, afford any ground for compelling her to litigate as a party to the rule against the sheriff. That the bank may, in case she in that petition obtains a judgment vesting the title to the property sold in herself as against L. R. Ray and his creditors, have obtained an inferior title to hers, would not, in view of the bank's own allegations, have warranted the court in drawing her into this litigation. As alleged in the amendment of April 16, her equitable petition was filed "prior to said sale," and she thereby sought "an injunction against said sale." This being so, not only does the doctrine of lis pendens apply as a legal impediment against the bank's alleged right to make Mrs. Ray a party, but it is also prevented from so doing under the equitable rule that no one can be relieved of the consequences of his own voluntary act uninfluenced by the fraudulent conduct of another. The fact appears that the bank, being itself the defendant in Mrs. Ray's equitable petition, had actual notice of its pendency, and of the claim she therein set up, and yet deliberately undertook to buy the property subject to whatever judgment might be rendered against it upon her peti-

tion.   The bank as a judgment creditor of Ray, claiming the pro-
ceeds of the sale under the execution against him, certainly had no
right to consolidate its case against the sheriff and other claimants
of the fund with Mrs. Ray's.   She did not, as has been seen, assert
any claim to the proceeds of the sale.   On the contrary, she set up
in her petition (the nature of which, however, is not fully dis-
closed), title in herself to the land sold, and sought to enjoin the
sale.   The bank brought the same about contrary to her wish, and
if it results that another creditor is better entitled to the proceeds,
and that as a consequence the bank will gain nothing by having
the land sold, it must take the consequences, for it alone is respon-
sible for bringing about such a result.   It follows, we think, that it
was not essential to the enforcement of any alleged right of the
bank that Mrs. Ray should be made a party to the case originated
by the rule against the sheriff; and this being so, the general ground
of her demurrer was good.   So also was her special demurrer.   The
bank did not, as it was thereby called upon to do, sufficiently set
forth, either by exhibit or otherwise, the real character of her equi-
table petition so that the propriety or impropriety of joining her
with the other defendants in the rule case might be made apparent.

2.  We will now address ourselves to the question: Was the exe-
cution in favor of the bank against Ray, under which the land was
sold, entitled to priority over the execution under which Swann was
claiming the proceeds of the sheriff's sale ?   The bank took orig-
inally, as security for its loan of $1,500 to Ray, a transfer of the
bond for title made to him by Morris.   This bond constituted no
lien upon the land.   The bank might have paid the purchase-money
to Morris and demanded of him a deed to itself, which it might by
Ray's agreement have held until the $1,500 debt had been paid;
or the bank might have waited until Ray paid the purchase-money
and then have demanded that Morris make to it, his transferee of
the bond, such a deed as he therein covenanted to make Ray.   The
quitclaim deed which Morris actually made to the bank gives it no
advantage whatever in this litigation.   According to the bank's own
allegations, this instrument was itself " conditioned to be void on
the payment of the purchase-money notes by L. R. Ray."   The bank
did not pay the purchase-money ; on the contrary, "Morris discounted
at said [bank] said purchase-money notes he had on Ray, and de-
livered in escrow a deed to L. R. Ray."   That is to say, the bank

did not itself satisfy these notes, but evidently held Morris liable thereon as indorser. Otherwise, he would have been fully paid for the land, and there would have been no occasion for him to make a deed in escrow to Ray. Nor did the bank elect to wait till Ray paid off his purchase-money notes and then demand a deed to itself from Morris. On the contrary, it consented to an arrangement whereby it should receive from Morris a deed made subject to the bond for title, as has just been shown, "conditioned to be void on the payment of the purchase-money notes by L. R. Ray." The bank thereby forever waived its right under the bond for title to demand from Morris an unconditional deed to itself, by which it might have retained title until its demand against Ray upon the loan to him should be paid. One feature of the arrangement which is alluded to was that the bank should have the right to withhold delivery of the deed in escrow to Ray until his indebtedness upon this loan was discharged. This, however, certainly did not operate as a lien upon the land, for it was merely the equivalent of a deposit as security of a bare muniment of title by a debtor with his creditor to guarantee the payment of a loan. Such a deposit operates neither to transfer to the creditor the debtor's title, nor to establish in favor of the former any lien, either legal or equitable, upon the property described in such muniment of title. Accordingly, when the purchase-money notes of Ray were paid, the deed from Morris to the bank became wholly inoperative under its own terms, and the legal title sought to be conveyed by the deed in escrow either still remained in Morris until the delivery thereof to Ray, or, under the doctrine of constructive delivery, passed into him by operation of law, notwithstanding there was no physical surrender of that deed to Ray by the depository, the bank. It matters not which of these propositions is to be taken as correct. Certain it is, the title was no longer in the bank. It is also immaterial whether the legal title to the land passed to the bank under the sheriff's sale. Relatively to Swann the contest was merely over the proceeds arising from that sale, and he was in no wise concerned whether the purchaser really got anything by the sale or not, since, under the rule of caveat emptor referred to above, the bank was bound to comply with its bid, and the money in this way realized from a sale of the property as that of Ray stood for distribution among his creditors, whether he had at the time of the sale any interest in the land or not. It

is, we think, made perfectly clear that, as the holder of the mere muniment of title, the bank could not successfully assert any legal lien on the land which would give its execution priority over that held by Swann.

3. The only remaining question on this branch of the case is whether or not the bank could, under the facts recited, set up an equitable lien on the land, and thus show a better right to the proceeds of the sale.    Equitable liens are, as a general rule, recognized only when a party can justly claim to be subrogated to the rights of one who had or has a legal lien; or where a creditor, though having no legal lien, has placed a common debtor in the possession of property which has enriched him to the benefit of all his creditors, and afforded them an opportunity to collect, in whole or in part, claims upon which they would otherwise have realized nothing. The bank does not bring itself within either branch of this rule. It parted with its $1,500 on the faith of a transfer of Ray's bond for title from Morris. That is, Ray bargained to the bank his equitable interest in the land in consideration of the loan.    This did not inure to the benefit of any creditor of Ray; for there is no pretense that any part of the $1,500 went into the land.    When the bank voluntarily gave up its right to redeem the land under this bond for title, it became a mere unsecured creditor holding a naked muniment of title.    Neither Ray nor his other creditors could enforce delivery of the escrow deed until the $1,500 debt had been paid, but at the same time the bank had no legal or equitable right to surrender this deed or file it with the clerk of the superior court for the sole purpose of allowing a sale under its own execution to the exclusion of other executions.    If the delivery of the escrow deed to the clerk had any effect at all, it effectually passed the Morris title into Ray for all general purposes; and all judgment liens against Ray immediately attached.    Swann held a lien of higher dignity than that afforded by the judgment against Ray in favor of the bank, and there is no reason in law or equity why he should not be allowed to claim the proceeds of the sale.    The embarrassing situation in which the bank finds itself was not caused by anything which Swann did or failed to do, but is attributable solely to its own voluntary acts.

4. There is one more question to be disposed of, to wit: Inasmuch as the proceeds of the sheriff's sale can not be appropriated

to the execution held by the bank, ought it, under the facts pleaded, to be relieved from paying its bid? Our conclusion is that this question should be answered in the negative. As has already been more than once remarked, the doctrine of caveat emptor applies to sheriff's sales. We have undertaken to show that there should be no relaxation of that doctrine in the present instance because of the pendency of Mrs. Ray's equitable petition. The bank knew that it was pending, and that Mrs. Ray was claiming title to the land. So far, then, as this matter is concerned, it bid off the land with its eyes wide open. It was urged, however, that the bank should be relieved of its bid, because, as would have appeared if the rejected amendment had been allowed, it was informed by the sheriff before the sale took place that there were no other liens in his hands to claim the proceeds of the sale, that it made its bid upon the strength of this information, and that it would not have bid off the land save only upon the idea that it would not be required to pay cash, but allowed to credit the amount of the bid, less expenses and costs, upon its own execution. In support of this contention counsel for the bank rely upon the case of *Glenn* v. *Black*, 31 *Ga.* 393. We do not think that case upon its peculiar facts is applicable to the case in hand, or that it should be extended one whit beyond those facts. It appeared in that case that before Glenn bid off the land he was informed of the existence of certain executions older than that of Crook, Glenn's client, under which the sale was to be had. Glenn thereupon expressed a willingness to pay off these executions. After the land had been knocked off to Glenn, he announced to the sheriff that he was ready to settle his bid, and proposed to pay off the executions just referred to, which were in the sheriff's hands at the time of the sale, and appropriate the balance of his bid as a credit upon the execution controlled by himself. "From some cause, the sheriff did not make the settlement *at that time.*" (The italics are the writer's.) When Glenn made this offer to settle, there were no executions in the sheriff's hands superior to that upon which Glenn was seeking to have the credit placed, save those which Glenn was ready to pay, and offered to pay. If then the sheriff had settled with Glenn as he should have done, the matter would have been closed before any other executions claiming the money came into the officer's hands. After the sheriff had postponed the time for settling with Glenn, other executions were

placed in the sheriff's hands to claim the money, the same being of higher dignity than that of Glenn's client. Under these circumstances this court held that Glenn was entitled to have made upon the execution the credit which he claimed should be entered thereon, and was not liable for the purchase-money in a suit against him by the sheriff. It is true that in discussing the case Jenkins, J., remarked that the owners of the executions which last made their appearance to claim the money were, in withholding the same, guilty either of laches or covin in not presenting them sooner. But be this as it may, we think the judgment rendered in that case can be better upheld upon the idea that the sheriff ought, under the facts recited, to have settled with Glenn when he was ready and willing to close the transaction before these last executions were placed in the officer's hands. It will not, on the strength of that case, do to lay down as a correct proposition that a purchaser at a sheriff's sale, merely because he is informed, before bidding off the property, that there are no liens, other than that under which he is bringing the sale about, to claim the proceeds, can, when other and superior liens are placed in the sheriff's hands to claim the money before the bidder offers to settle with the officer, be allowed to repudiate his bid and refuse to pay for the property. Every purchaser at a sheriff's sale must, at his own risk, ascertain what liens are in existence upon the property, and is, as matter of law, bound to know that holders of these liens have the right to come in at any moment before the money is actually paid out, and claim the same. It requires no argument to establish the correctness of this well-nigh universal rule. Though the case cited supra seems to afford an example of an exception thereto, we are quite convinced that the case in hand does not come within that exception.

*Judgment affirmed. All the Justices concurring, except Little, and Lewis, JJ., absent.*