**FOURTH DIVISION**
**DILLARD, P. J.,**
**MERCIER, J., and SENIOR JUDGE FULLER**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

**September 30, 2025**

# In the Court of Appeals of Georgia

A25A1010. GALEANA v. MCCOMMON et al.

DILLARD, Presiding Judge.

Maria Cristina Valle Galeana and Karla Guillen Valle[1] appeal from the trial court's judgment for Erin McCommon, Brian McCommon, and J.P. Morgan Chase Bank, N.A.,[2] in a property dispute. The appellants argue the trial court erred by (1) adopting a special master's report as its final judgment, and (2) permitting appellees to file a late, previously omitted counterclaim. For the following reasons, we affirm in part and reverse in part.

---

[1] We sometimes refer to Maria Cristina Valle Galeana and Karla Guillen Valle collectively as the "appellants."

[2] We refer to Erin McCommon, Brian McCommon, and J.P. Morgan Chase Bank, N.A., collectively as the "appellees."

From 2018 through 2019, Valle lived at 1304 Bernadette Lane in Atlanta with her cousin, Fernando Cristobal Montenegro Valle. Both prior to and after this period, Valle lived in Reno, Nevada; but she temporarily moved in with Fernando because he was in poor health and needed assistance. Valle did not pay rent to Fernando but took care of him by cooking meals and cleaning the property. Eventually, she returned to Reno to be near her sons. But later in 2019, Fernando was hospitalized, and Galeana[3] moved to Atlanta to care for him due to the severity of his illness. And during this time, Galeana stayed in the Bernadette Lane house and did so until the end of 2021.

In August 2021, Fernando got in legal trouble and Valle posted bond for him, using her personal car as collateral and placing herself at risk of owing $110,200 if Fernando did not appear in court on his charges.[4] According to Valle, when Fernando called to ask for help, he agreed to transfer the Bernadette Lane property to her in exchange for posting his bond. In other words, the transfer of his property to Valle was a guarantee that he would appear for court. There was no discussion about whether Fernando expected Valle to transfer the property back after he fulfilled his obligations.

---

[3] Galeana—who is now deceased—was Fernando's aunt and Valle's mother.

[4] The current status of Fernando's criminal charges is unknown.

Then, on September 29, 2021, Fernando executed a quitclaim deed transferring the Bernadette Lane property to both Valle and Galeana as joint tenants with right of survivorship. Six days later, Fernando forwarded a copy of the recorded deed to Valle, which was attached to the following message that Fernando received from LegalZoom/GoDeeds:

> Dear [Fernando]:
>
> Congratulations on the successful transfer of your property. Your deed has been electronically recorded by your county and the *recorded deed is attached* to this email. You should print a copy and retain [it] for your records. If you are unable to print your document and would like us to mail you a copy, please let us know.
>
> *Please be advised that since your deed was recorded online electronically, the only document that is provided by the county is the digital recorded document attached.*

Fernando forwarded this message and its attachment (*i.e.*, the recorded deed) without additional comment. After doing so, Fernando told Galeana the transfer of the property was "irreversible," and the house now belonged to her and Valle. And significantly, the taxes for the Bernadette Lane property were then paid in Valle and Galeana's names.

But several months later, apparently after Valle and Galeana declined a request to transfer the property back to Fernando, he forged a deed—dated December 24, 2021, and executed on February 10, 2022—purporting to transfer the property from the appellants back to himself, and using his friends as the notary public and witness. Fernando then listed the property for sale without Valle or Galeana's knowledge. And after the McCommons purchased the property on March 31, 2022, Fernando disappeared and could not be located. Indeed, Valle and Galeana only learned of the sale when a family friend informed them of it.

On October 3, 2022, Valle and Galeana filed a quiet-title action against the McCommons in the Superior Court of DeKalb County, requesting the appointment of a special master to determine the parties' rights to the Bernadette Lane property. In their answer, the McCommons asserted, among other things, that the quitclaim deed purporting to transfer title of the property from Fernando to the appellants was never delivered, and so there was no intent to actually transfer the property. The appellants then moved for partial summary judgment on March 31, 2023. Later, the McCommons also moved for summary judgment.

4

On July 24, 2023, the McCommons moved to amend their answer to add a counterclaim, seeking setoff from Valle and Galeana as to any improvements they made to the property (if the appellants obtained a decree of title in their favor). The appellants opposed this motion. Then, on August 16, 2023, the trial court issued an order ruling on all pending motions before it. And in doing so, the court denied both motions for summary judgment and granted the McCommons' motion to amend their answer to add a counterclaim for setoff. The court then appointed a special master at the parties' request. Finally, the court granted a joint motion to add J.P. Morgan Chase Bank—the McCommons' lender—as a defendant.

After a hearing, the special master issued her report on September 20, 2024. In the report, the special master made findings of fact—including that when Valle and Galeana refused to return title to the property to Fernando, he forged their signatures on the deed executed on February 10, 2022.[5] But the special master also concluded that, as a matter of law, the original "wet ink" 2021 quitclaim deed was not delivered to the appellants and so it never transferred title to them. As a result, the special

---

[5] As the special master correctly concluded, "[a] forged deed is a nullity and vests no title in a grantee." *Vatacs Grp., Inc. v. U.S. Bank, N.A.*, 292 Ga. 483, 485 (2) (738 SE2d 83) (2013).

master found that Fernando always retained title and successfully sold the property to the McCommons in March 2022 (despite forging the February 2022 deed). Thus, the special master recommended the trial court declare the 2021 quitclaim deed invalid and that fee simple title be vested in the McCommons subject to J.P. Morgan's deed to secure debt. Over the appellants' objections, the trial court adopted the special master's report as its final judgment.[6] This appeal follows.

1. Valle and Galeana argue the trial court erred in adopting the special master's report as its final order for several reasons. We will address each of these reasons in turn.[7]

---

[6] *See* OCGA § 23-3-67 ("Upon the receipt of the master's report or upon a jury verdict, the court shall issue a decree which shall be recorded in the office of the clerk of the superior court of the county or counties wherein the land affected lies and which, when recorded, shall operate to bind the land affected according to the tenor thereof and shall be conclusive upon and against all persons named therein, known or unknown. A marginal reference to the recorded judgments and decree shall be entered upon any recorded instrument stated to be affected thereby.").

[7] We do not address the appellants' additional enumeration of error regarding the trial court's denial of their motion for summary judgment because the court's adoption of the special master's report as its judgment rendered the denial of the motion for summary judgment moot. *See Pentagon Props., Inc. v. Wheat*, 320 Ga. App. 656, 658 (1) (740 SE2d 374) (2013) ("After verdict and judgment, . . . it is too late to review a judgment denying a summary judgment, for that judgment becomes moot when the court reviews the evidence upon the trial of the case." (punctuation omitted)); *Kaufman Dev. Partners, L.P. v. Eichenblatt*, 324 Ga. App. 71, 74 (2) (749

To begin with, when a case is submitted to a special master,[8] as Valle and Galeana requested and was done here, the trial court "must independently evaluate the correctness of the special master's report before adopting it as the judgment of the court."[9] And once adopted by the court, these findings will be "upheld by the appellate court unless clearly erroneous."[10] So, if there is any evidence supporting the

SE2d 374) (2013) ("Generally, a ruling on a motion for summary judgment becomes moot following the verdict and judgment. However, a party may appeal the denial of summary judgment as part of the direct appeal from the final judgment if the legal issues raised and resolved in denying the motion for summary judgment were not considered at trial." (punctuation omitted)).

[8] *See* OCGA § 23-3-63 ("The court, upon receipt of the petition together with the plat and instruments filed therewith, shall submit the same to a special master who shall be a person who is authorized to practice law in this state and is a resident of the judicial circuit wherein the action is brought.").

[9] *Tyner v. Edge*, 355 Ga. App. 196, 196 (843 SE2d 632) (2020) (punctuation omitted); *accord Steinichen v. Stancil*, 281 Ga. 75, 76 (2) (635 SE2d 158) (2006).

[10] *Nelson v. Ga. Sheriffs Youth Homes, Inc.*, 286 Ga. 192, 193 (686 SE2d 663) (2009); *accord DeCay v. Houston*, 295 Ga. 223, 224 (1) (758 SE2d 286) (2014); *see McGregor v. River Pond Farm, LLC*, 312 Ga. App. 652, 653 (1) (719 SE2d 546) (2011) ("Although the special master does not divest the trial court of overall jurisdiction of the case, once the trial court adopts the special master's findings and enters judgment, the court's decision is upheld by the appellate court unless clearly erroneous." (citation omitted)).

court's judgment, it "will not be disturbed."[11] Even so, when a court submits a quiet-title action to a special master, it "does not cede jurisdiction to render a final decision, and [it] is not obligated to accept a special master's erroneous legal conclusion[s]."[12] And needless to say, this Court reviews any questions of law *de novo*.[13] With these guiding principles in mind, we turn now to the appellants' enumerated errors.

a. *The special master made unsupported findings of fact.* A crucial finding of fact by the special master was that "it appears that the original 2021 Quitclaim Deed never left Mr. Fernando's possession."[14] The special master also found—in concluding the deed was never delivered to Valle and Galeana—that Fernando "retained the deed

---

[11] *DeCay*, 295 Ga. at 224 (1) (punctuation omitted); *accord Smith v. Mitchell Cnty.*, 334 Ga. App. 374, 378 (2) (779 SE2d 410) (2015); *see CB Lending, LLC v. Strategic Prop. Consulting Grp., LLC*, 353 Ga. App. 114, 114 (834 SE2d 618) (2019) ("We . . . defer to the trial court's judgment on matters of fact to the extent that judgment is supported by any evidence before either it or the special master.").

[12] *Eardley v. McGreevy*, 279 Ga. 562, 564-65 (2) (615 SE2d 744) (2005).

[13] *See Republic Title Co., LLC v. Freeport Title & Guar., Inc.*, 351 Ga. App. 408, 409 (829 SE2d 172) (2019) ("Once the trial court adopts the special master's findings and enters judgment, the court's decision is upheld by the appellate court unless clearly erroneous b]ut conclusions of law are reviewed de novo." (punctuation omitted)); *accord Freeport Title & Guar. Inc. as Tr. of 4977 Mem'l Tr. v. Tegeue*, 360 Ga. App. 18, 20 (858 SE2d 554) (2021).

[14] Although the appellees continue to refer to the deed as a "Deed of Gift" in their briefs, the special master rejected this characterization.

after having it recorded electronically, but then retained the original [sic], which can be said to have rendered the deed inoperative." The appellants claim no evidence supports the special master's finding that Fernando maintained possession of an original hard copy of the deed and so the trial court erred by adopting this finding. We agree.

The *only* evidence on the ultimate location of the original "wet ink" deed came via the email Fernando forwarded to Valle, which contained an attached .pdf copy of the deed. And again, that email included the following language:

> Congratulations on the successful transfer of your property. Your deed has been electronically recorded by your county and the *recorded deed is attached* to this email. You should print a copy and retain [it] for your records. If you are unable to print your document and would like us to mail you a copy, please let us know.
>
> *Please be advised that since your deed was recorded online electronically, the only document that is provided by the county is the digital recorded document attached.*

The forwarded email was from an original sender of Billing@godeeds.com with the subject: LegalZoom Completed Real Estate Deed Transfer Order #5509854889. And

the attached deed—which was prepared by an attorney—contained the following

instruction on top:

> AFTER RECORDING RETURN TO:
> GODEEDS, INC.
> Attn: LegalZoom Dept.
> 8940 Main Street
> Clarence, NY 14031
> File No. 5509854889-69854701

So, according to the evidence before both the special master and the trial court,

Fernando only received an electronic copy of the recorded deed.[15] And because the

special master's crucial finding that Fernando maintained possession of the *original*

"wet ink" deed is unsupported by the record, the court clearly erred in adopting this

finding.[16]

---

[15] In another email from LegalZoom/GoDeeds, the company explained that "[o]nce recorded, the County will return the recorded Deed to GoDeeds so that we can put it on file in our office and then email you a copy of the electronically recorded Deed. The reason that we put it on file in our office is because if you ever misplace the Deed, we can always resend it to you." This same email also explained that "the document that we will return to you will be an electronically filed Deed" and "[t]here will be no hard copy of the Deed in existence" because "[t]he entire process (with the exception of the Deed Documents that you mail back to us) will be done electronically." While this email was not in evidence before the special master, it was in the trial court record before the special master's report was adopted.

[16] We need not address the appellants' additional argument that the trial court erred by adopting the special master's finding that they never resided at or helped to

b. *The trial court failed to ensure the special master's conclusions of law were correct.*

Next, Valle and Galeana argue the trial court failed to ensure the special master's conclusions of law were correct. And because the special master's conclusions of law were based on an erroneous factual finding, we agree.[17]

But before we begin our analysis, we first acknowledge that the unique facts of this case—whether the delivery of an electronic copy of a deed suffices for the transfer of property under Georgia law—presents an issue of first impression. It is prudent, then, to begin with an explanation of Georgia's "delivery" requirement, as delineated in OCGA § 44-5-30:

> Except for documents electronically filed as provided for in Chapter 12 of Title 10[18] and Part 1 of Article 1 of Chapter 2 of this title,[19] a deed to lands shall be an original document, in writing, signed by the maker, attested by an officer as provided in Code Section

maintain the subject property.

[17] Importantly, whether the facts "constitute a delivery of the deed is a question of law[.]" *Stinson v. Daniel*, 193 Ga. 844, 850 (2) (20 SE2d 257) (1942) (punctuation omitted).

[18] Chapter 12 of Title 10 encompasses the Uniform Electronic Transactions Act. *See* OCGA § 10-12-1 *et seq.*

[19] Part 1 of Article 1 of Chapter 2 of Title 44 concerns the recording of deeds and other real property transactions. *See* OCGA § 44-2-1 *et seq.*

44-2-15,[20] and attested by one other witness. *It shall be delivered to the purchaser or his or her representative* and be made on a good or valuable consideration.[21]

Hundreds of years ago, land was transferred by way of a formal ceremony—*livery of seisin*, which was a symbolic delivery of the land.[22] This ceremonial transfer was generally accomplished by the grantor and grantee "go[ing] together upon the land, and the former . . . hand[ing] to the latter a piece of soil, or

---

[20] OCGA § 44-2-15 provides that such attestations may be made "by a judge of a court of record, including a judge of a municipal court, or by a magistrate, a notary public, or a clerk or deputy clerk of a superior court or of a city court created by special Act of the General Assembly."

[21] (Emphasis supplied).

[22] *See Heitman v. Com. Bank of Savannah*, 6 Ga. App. 584, 599 (2) (65 SE 590) (1909) ("In olden times, when form was everything and substance nothing, and the only method of transferring title to land was by feoffment with livery of seisin, the transfer of title was accomplished by formal ceremony alone. . . .This ceremony was symbolic of delivery of the land itself. Thereafter the transferee or feofee had been invested with livery of seisin, and he was the owner of the land."); *see also* Sarah B. White, *Legacies and Legalities: Bequests of Land to Ecclesiastical Institutions in England C. 1180-1300*, 42 LAW & HIST. REV. 691, 691 (November 2024) (noting that "[o]nce the transfer of land required the livery of seisin (a formal legal conveyancing ceremony wherein the transferor gave the transferee a physical piece of the ground itself), a practice introduced during the reign of Henry II (1154-89)").

plac[ing] in his hand the hasp or ring of the door, or a rod, or perhaps a glove."[23] But

this practice was eventually (and understandably) replaced by the transfer of deeds.

In 1785, the Georgia General Assembly acknowledged that "many deeds of

bargain and sale, and other deeds of feoffment or conveyance, have been made, which

have not been enrolled, or livery and seisin had, or may be deficient in point of form,

when it was the legal intent of the party to sell and lawfully convey the same," and in

doing so provided that such deeds were valid.[24] Our General Assembly then

established a manner of conveyance that did *not* require livery of seisin, instead

requiring a written document signed in the presence of two witnesses and recorded

with the County Clerk of Court.[25] The earliest precursor to our modern statute was

---

[23] *See Heitman*, 6 Ga. App. at 599 (2).

[24] *See* Laws 1785, Cobb's 1851 Digest 164, *available at* https://digitalcommons.law.uga.edu/ga_code/4/.

[25] *See* Laws 1785, Cobb's 1851 Digest 164-65 ¶ 14 § 2 (providing that "all deeds of conveyances, by way of bargain and sale, *bona fide*, of lands or tenements, and executed under hand and seal in the presence of two witnesses,[ ] and a valuable consideration paid, that are proved or acknowledged before a Justice of the Peace,[ ] or before the Chief Justice, or one of the assistant Justices, and the said deed is registered by the Clerk of the Court in the County where such lands or tenements lie, in a book by him to be kept for that purpose, within twelve months[ ] from the date such of such deed, for which he shall receive four pence per copy sheet of ninety words; then, and in that case, such deed of conveyance by bargain and sale shall be,

§ 2648 of the Code of 1863, which provided that "[a] deed to land in this State must be in writing, signed by the maker, attested by at least two witnesses, and delivered to the purchaser, or some one for him, and be made on a valuable or good consideration."

As the Supreme Court of Georgia explained over one hundred years ago, the delivery of a deed of grant was "regarded as in effect the symbolical transfer of the land itself, analogous to livery of seisin."[26] As a result, a physical or manual delivery was "deemed essential."[27] But as early as 1855, Georgia recognized that the delivery of a deed "may be by words without act, or by acts without words."[28] So, contrary to the doctrine of earlier cases, the "modern English view [became] that delivery is

---

and the same is hereby declared to be good and valid in Law and Equity, according to the true intent, construction, and meaning thereof . . . ."), *available at* https://digitalcommons.law.uga.edu/ga_code/4/.

[26] *Willingham v. Smith*, 151 Ga. 102, 103 (106 SE 117) (1921).

[27] *Id.*; *see Dobbs v. First Nat. Bank of Atlanta*, 65 Ga. App. 796, 797 (2) (16 SE2d 485) (1941) ("With reference to the transfer of estates in lands 'livery of seisin' gave way to the usage of deeds as symbolic of transfers. From the first inception of the use of written transfers or deeds to lands there was connected with such use the idea of the delivery of the deed itself as symbolic of the transfer of the lands analogous to 'livery of seisin.' That is, the physical transfer of the document was necessary to make it operative.").

[28] *Wellborn v. Weaver*, 17 Ga. 267, 272 (7) (1855).

largely a question of *intention*."[29] And to that end, the delivery of a deed may be constructive[30] and "*inferred* from various circumstances."[31] In other words, manual delivery is not "always essential to effect a legal delivery of the deed."[32]

---

[29] *Willingham*, 151 Ga. at 103 (emphasis supplied); *see Dobbs*, 65 Ga. App. at 797 (2) ("In modern times we have passed from the early conception of manual transfer of the document itself to the 'modern view' of intention of the parties with regard to the delivery of the instrument. This now seems to be the prevailing view in practically all, if not all, of the jurisdictions, and takes control over the idea of manual transfer. For the deed to become operative as a transfer of title it must be established by facts and circumstances attendant upon the transaction sufficient to show that it was the intention of the grantor to deliver, and of the grantee to accept, the deed as an instrument designated to transfer title 'inter vivos.'"); *see also Beard v. White*, 120 Ga. 1018, 1021(3-6) (48 SE 400) (1904) (explaining that "[i]n Georgia there is no livery of seisin" and that "[p]ossession is not necessary to the acquisition of title to land").

[30] *See Smith v. David*, 168 Ga. 511, 528 (3) (148 SE 265) (1929) ("[T]here was a constructive delivery of the deed to the grantee named therein, and the title to the property thereby conveyed passed to the latter."); *Atlanta Tr. & Banking Co. v. Nelms*, 115 Ga. 53, 61 (2) (41 SE 247) (1902) (explaining that "under the doctrine of constructive delivery," title passes "by operation of law, notwithstanding there [is] no physical surrender of th[e] deed").

[31] *Smith v. Tibbits*, 359 Ga. App. 362, 366 (1) (857 SE2d 820) (2021) (emphasis supplied).

[32] *Johnson v. Johnson*, 327 Ga. App. 604, 606 (760 SE2d 618) (2014); *see Childs v. Mitchell*, 204 Ga. 542, 544 (50 SE 216) (1948) ("Manual delivery to the grantee or his agent is not the only way in which an intention to pass title to property may be signified by the grantor." (punctuation omitted)).

Undoubtedly, execution of a deed without delivery "does not pass title, and delivery that passes title must be made during the lifetime of the grantor."[33] So, what then is the true test of delivery? Stated simply, it is whether the grantor intended to reserve "an opportunity for changing [his] mind, an opportunity to undo what [he] has done, or a right to withdraw from an incomplete transaction."[34] And there are many circumstances that can indicate a grantor's intentions. For example, when a deed is recorded, a presumption arises that the deed was delivered.[35] A presumption

---

[33] *Robinson v. Williams ex rel. Est. of Dunn*, 280 Ga. 877, 879 (2) (635 SE2d 120) (2006) (punctuation omitted).

[34] *Johnson*, 327 Ga. App. at 606-07 (punctuation omitted); *accord Smith*, 359 Ga. App. at 366 (1); *see Keesee v. Collum*, 208 Ga. 382, 386 (1) (67 SE2d 120) (1951) ("Unless [the deed] had passed from [the grantor's] control there was no delivery, although there might have been in his mind a determination to deliver it at some future day. So long as there remained an opportunity for him to change his mind, and this period continued until it was delivered, the title did not pass by virtue of the execution of the deed, even though it had been recorded at his own instance. The true test of delivery of a deed of conveyance is whether or not the grantor intended to reserve to himself the locus penitentiae." (punctuation omitted)). *But see Willingham*, 151 Ga. at 104 ("[W]hether a deed has been delivered cannot be made to turn merely on the question of intention.").

[35] *See Allen v. Bemis*, 193 Ga. 556, 563 (2) (19 SE2d 516) (1942) ("The deed in question having been duly recorded, this record is presumptive evidence of its delivery. But this presumption is rebuttable; and where there is evidence of non-delivery of a deed, an issue of fact arises and it is for the jury to decide whether or not the deed was in fact delivered." (citations omitted)); *Daniel v. Stinson*, 179 Ga.

of delivery also arises when a grantor treats the property as the property of the grantee,[36] such as by paying taxes on the property in the grantee's name.[37] And when such circumstances are present, "in the absence of explanation or rebutting proof, they would show the delivery of the deed, *although it was in the possession of the grantor* when he died some years after its date."[38] In other words, contrary to the appellees'

---

701, 701 (177 SE 590) (1934) (Syllabus) ("The act of registering a deed does not amount, necessarily, to a delivery. When placed on record by the grantor or by his direction, it is only prima facie evidence of delivery, and may be explained or rebutted."(punctuation omitted)); *Follendore v. Follendore*, 110 Ga. 359, 362 (35 SE 676) (1900) ("That the latter deed was recorded afforded only presumptive evidence of delivery, and this presumption was overcome by positive testimony to the contrary."); *Bourquin v. Bourquin*, 110 Ga. 440, 446 (35 SE 710) (1900) ("The defendant having caused the deed to be placed on record, a presumption that the deed had been delivered arose.").

[36] *See Bourquin*, 110 Ga. at 446 ("The fact that the grantor treats the property as the property of the grantee raises a presumption of delivery.").

[37] *See Patterson v. Patterson*, 210 Ga. 359, 359 (6) (80 SE2d 310) (1954) ("Where the grantor gave in the lot conveyed for taxation as the property of the grantee for several years succeeding the execution of the deed, this was a strong manifestation of the grantor's understanding that he considered the deed delivered and the title conveyed." (punctuation omitted)).

[38] *Bourquin*, 110 Ga. at 446 (punctuation omitted) (emphasis supplied); *see Ross v. Campbell*, 73 Ga. 309, 317 (1884) ("That the grantor had possession of the land after he made the deed, is entirely consistent with the terms upon which he declared in 1883 he held it. He controlled and managed as the grantee's agent, and *this fact goes far to explain his possession of the deed at his death*." (emphasis supplied)).

17

assertions, *even if* an original "wet ink" deed remains in the grantor's possession, evidence of an intent to transfer the property to the grantee can establish delivery.[39] That said, evidence that rebuts a presumption of delivery can include a grantor

[39] *See Bourquin*, 110 Ga. at 446; *Ross*, 73 Ga. at 317. *Cf. Robinson*, 280 Ga. at 879 (2) ("[When] a grantor retains a deed which he executes in his possession and control until his death *without doing anything to indicate an intention to deliver it*, it is void for want of a delivery." (punctuation omitted) (emphasis supplied)); *Johnson*, 327 Ga. App. at 607 ("To make a deed effective at the time of its execution, there must be satisfactory proof that it was the intention of the grantor that the instrument should operate to immediately convey to the grantee title to the premises therein described and the grantor's purpose to deprive himself of power and control over the instrument for the benefit of the grantee must be shown." (punctuation omitted)).

Yet, our Supreme Court has explained that when a *grantee* possesses the deed, that raises a presumption of delivery which may be rebutted by evidence that the grantor *did not* intend to surrender dominion. *See Grice v. Grice*, 197 Ga. 686, 693 (2) (30 SE2d 183) (1944) (explaining that when deed was found in grantee's possession, this raised a rebuttable presumption of delivery and that "it still could be shown that, as a matter of fact, the deed was never delivered to the grantee by authority of the grantor, and proof of such nondelivery could be made by circumstantial as well as direct evidence" because "mere manual delivery to the grantee is insufficient, unless an intention to surrender dominion is also present" (citations omitted)); *see also Morris v. Johnson*, 219 Ga. 81, 93 (2) (d) (132 SE2d 45) (1963) (explaining that when, "in giving the grantee possession of a deed, the intention is merely that he examine the deed, or transmit it to a third person for a particular purpose, [when] a deed is given to the grantee for safekeeping or to aid in the transfer of title to another prospective purchaser, there is no legal delivery of the instrument which will pass title to the property"); *Dobbs*, 65 Ga. App. at 797 (2) ("Neither the manual possession of the deed nor the physical possession of the property, and in some cases no doubt the possession of both, is not [sic] conclusive as to delivery or vice versa."); *Dixon v. Bristol Sav. Bank*, 102 Ga. 461, ___ (3) (31 SE 96) (1897) ("The mere delivery of manual possession of the deed is not necessarily a delivery of the deed[.]").

remaining in possession of the deed *and* continuing to exercise actual ownership of the land.[40]

Here, Fernando forwarded the LegalZoom email containing a .pdf copy of the recorded deed to Valle, which was also the only document *Fernando* received at the conclusion of the transfer process. And other facts raise a presumption of delivery: the recordation of the deed, Fernando's statements to Galeana that the property now belonged to her and Valle and was irreversible, the payment of property taxes in the

---

[40] *See Clowers v. Clemons*, 185 Ga. 567, 570 (2) (196 SE 28) (1938) ("The presumption of delivery arising from the due attestation and registration of the deed may be rebutted by evidence tending to show that the maker of the deed retained the actual possession of it and continued to exercise actual ownership over the land therein described." (punctuation omitted)); *see also Johnson*, 327 Ga. App. at 607 (holding that there was no delivery when grantor retained possession of the property and the deed and then later transferred the property to a *different* grantee, indicating he changed his mind about transferring to the original grantee); *Willingham*, 151 Ga. at 104-05 (holding that an unrecorded deed that was retained by the grantor was not delivered, despite telling others about the deed, when grantor was "a man of affairs" who was "familiar with the forms of procedure requisite to make a valid conveyance of real estate," though he signed the deed with "the purpose of thereafter delivering the same"). *But see Patterson*, 210 Ga. at 359 (3) (rejecting assertion of non-delivery when the grantor of land retained possession of the original deed and the property after conveying the land but retaining a life estate); *Chattahoochee Fertilizer Co. v. Quinn*, 169 Ga. 801, 802-03 (1) (151 SE 496) (1930) (rejecting assertion of non-delivery when grantees presented a certified copy of the deed, which was recorded, when the original deed was destroyed by a third party).

appellants' names, and Fernando's ultimate forgery of their signatures to return the property to himself when they refused to do so.

To rebut this evidence, the McCommons note that Fernando never provided Valle and Galeana with the original "wet ink" deed and that he remained in possession of the property while the appellants returned to homes outside of Georgia. But as explained below, there is no evidence Fernando possessed the original "wet ink" deed. To the contrary, the evidence suggests LegalZoom possessed (and still possesses) the original deed. As a result, we conclude that, as a matter of law, Fernando's continued possession of the property does not rebut the presumption that he intended to part with *legal* possession and constructively delivered the deed—via an electronic copy—to the appellees.[41] Accordingly, the trial court erred by adopting

---

[41] *See Smith*, 168 Ga. at 528 (3) ("[T]here was a constructive delivery of the deed to the grantee named therein, and the title to the property thereby conveyed passed to the latter."); *Nelms*, 115 Ga. at 61 (2) (explaining that "under the doctrine of constructive delivery," title passes "by operation of law, notwithstanding there [is] no physical surrender of th[e] deed"); *see also Childs*, 204 Ga. at 544 ("Manual delivery to the grantee or his agent is not the only way in which an intention to pass title to property may be signified by the grantor." (punctuation omitted)); *Bourquin*, 110 Ga. at 447 ("The evidence authorized but one finding, and that is that the defendant intended to devest [sic] the title of the estate that he represented, and transfer the same in such a way that it would inure to the benefit of his son; that he did everything in his power to accomplish this purpose; and that after it was complete, on account of some grievance, either real or supposed, against his son, he endeavored to

the special master's erroneous legal conclusion.[42] So, we reverse the trial court's judgment in this regard.

2. Finally, Valle and Galeana contend the trial court abused its discretion by concluding that justice required permitting the McCommons to file a late, originally omitted counterclaim—*i.e.*, the one for setoff. More precisely, they maintain the court should not have permitted this action when the McCommons were aware of the counterclaim before filing their answer and because they "waited an unreasonable amount of time before seeking leave to amend." We disagree.

As to compulsory counterclaims, under OCGA § 9-11-13, "[a] pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire

---

deprive him of rights which had so thoroughly vested that nothing he could do could deprive him of them.").

[42] We need not—and do not—reach the question of the Uniform Electronic Transactions Act's applicability to resolve this appeal.

jurisdiction."[43] But as to omitted counterclaims, the statute further provides that "[w]hen a pleader fails to set up a counterclaim through oversight, inadvertence, or excusable neglect, or when justice requires, he may by leave of court set up the counterclaim by amendment."[44]

The "justice requires" provision furnishes "an independent ground for setting up an omitted counterclaim,"[45] and a trial court "should grant leave to set up an omitted counterclaim when justice requires even though the other grounds, oversight, inadvertence, or excusable neglect, are not present."[46] As we have explained, "[b]ecause an omitted compulsory counterclaim may be otherwise barred, as a general rule leave to amend and set up a counterclaim shall be given freely, but this does not dispense with the necessity of showing that justice so requires."[47] And the determination of whether "justice requires the grant of leave to set up an omitted

---

[43] OCGA § 9-11-13 (a).

[44] OCGA § 9-11-13 (f).

[45] *Boyd v. JohnGalt Holdings, LLC*, 294 Ga. 640, 641 (1) (755 SE2d 675) (2014) (punctuation omitted).

[46] *Id.* (punctuation omitted).

[47] *Talbot Const., Inc. v. Triad Drywall, LLC*, 333 Ga. App. 815, 818 (777 SE2d 503) (2015).

counterclaim is a matter which addresses itself to the sound discretion of the trial court."[48] Thus, we review a trial court's decision to permit the addition of the counterclaim for an abuse of discretion.[49]

Here, the McCommons moved to amend their answer to include the omitted counterclaim eight months after Valle and Galeana filed their initial complaint. The appellants opposed the motion, asserting, among other things, that they would be prejudiced by the belated addition of a claim that would "*completely* change the nature of this case." More precisely, the appellants asserted that discovery closed three months prior, and there were now competing motions for summary judgment ripe for review. Adding the claim, then, would—according to the appellants—require reopening discovery, serving all new written discovery requests, retaining experts, and inspecting the property—all of which would lead to additional motions, including new motions for summary judgment, and would delay resolution of the case. But in

---

[48] *Id.*

[49] *See Clairmont Foods, Inc. v. Huddle House, Inc.*, 142 Ga. App. 171, 171 (1) (235 SE2d 635) (1977) ("As we have previously pointed out in construing [OCGA § 9-11-13 (f)], the trial judge is vested with discretion which will not be controlled absent a legal abuse.").

granting the McCommons' motion, the trial court concluded there would be "no unfair prejudice" to the appellants.

Importantly, Valle and Galeana do not challenge the trial court's determination that there would be "no unfair prejudice" to them by permitting the addition of the omitted counterclaim. Instead, they focus on their other arguments below—*i.e.*, that appellees were aware of the counterclaim before filing their answer and that they "waited an unreasonable amount of time before seeking leave to amend." But as our Supreme Court has explained, "because the failure to plead a compulsory counterclaim can result in loss of that counterclaim forever, the courts generally should be forgiving when leave is sought to add compulsory counterclaims, *at least so long as the plaintiff makes no showing of prejudice*."[50] And because the appellants do not challenge the trial court's conclusion that they would not be prejudiced by the McCommons' belated filing of their counterclaim, we cannot conclude the trial court

---

[50] *Boyd*, 294 Ga. at 642 (1) (emphasis supplied); *accord Jones v. Lick Log Creek, Inc.*, 366 Ga. App. 899, 907 (2) (884 SE2d 570) (2023); *Talbot Const*, 333 Ga. App. at 818.

abused its discretion by permitting the addition of the omitted counterclaim and thus affirm this portion of the trial court's judgment.[51]

For all these reasons, we reverse in part and affirm in part.

*Judgment affirmed in part and reversed in part. Mercier, J., and Senior Judge C. Andrew Fuller, concur.*

---

[51] *See Stewart v. Johnson*, 358 Ga. App. 813, 821 (5) (a) (856 SE2d 401) (2021) ("The trial court found that allowing the [party] to assert omitted counterclaims would serve the interest of justice, and Appellants have offered no explanation as to how they were prejudiced, if at all. Accordingly, we cannot say that the trial court erred by allowing the [party] to amend their answer and counterclaim . . . ."); *White v. Fid. Nat. Bank*, 188 Ga. App. 539, 540-41 (373 SE2d 640) (1988) ("[Appellants] have not shown how they were prejudiced as a result of the granting of leave. Accordingly, it cannot be said the trial court abused its discretion in granting leave to set up the omitted counterclaim.").